MILTON A. REID, ET AL.

V.

ULYSSES GHOLSON, ET AL.

Record No. 840057

Decided March 8, 1985, at Richmond

Present: All the Justices

*William M. Kunstler; James F. Gay (Legal Center of James F. Gay,* on briefs), for appellants.
*Edward Delk (Delk, Jackson & Holmes,* on brief), for appellees.

RUSSELL, J., delivered the opinion of the Court.

This appeal is an outgrowth of a protracted and complex dispute between two factions in the membership of a congregational church. Both factions, at various times, resorted to the courts. Among other things, the court below appointed a commissioner in chancery to "run and oversee" a congregational meeting to insure its fairness. The sole question presented on appeal is whether that ruling was an unwarranted breach of the principle of separation of church and state embodied in art. I, § 16 of the Constitution of Virginia and the First Amendment to the Constitution of the United States.

## I. FACTS and LEGAL PROCEEDINGS.

In order that the issue may be seen in proper perspective, a detailed examination must be made of the facts and legal proceedings below, as shown by the record, including those which preceded the filing of this suit and those which took place pending appeal. The New Calvary Baptist Church is a large independent congregational church in the City of Norfolk. It has no written constitution or by-laws and has traditionally been governed by majority vote of its members present and voting at annual congregational meetings. It has never been subject to the control of any hierarchical or supercongregational authority. Customarily, notices of proposed congregational meetings were announced at worship services on two successive Sundays prior to the meeting and also were published in the newsletter mailed to each member of the church.

Milton A. Reid has been pastor of the church throughout the period of the dispute. One faction of the membership, which includes several deacons, consists of those who support his views. For convenience, this group will be referred to as "adherents."[1] Those who oppose Reid's views, for convenience, will be called

---

[1] The adherents who appear as appellants here are Milton A. Reid, Briscoe Boddie, Kenneth Bellamy, St. Paul Lewis, and James Bridgers.

"dissenters." Those who appear here as appellees, representing the dissenting faction, are Ulysses Gholson and Floyd Lewis, although other individuals have appeared in related litigation as representatives of this group. Gholson and Lewis are trustees of the church, elected by the membership in 1978 to hold title to the church property and appointed in 1980 by court order to serve in that capacity pursuant to Code § 57-8.

In November 1982, certain dissenters filed a bill of complaint against the pastor and certain adherents,[2] asking for a court-ordered congregational meeting to consider resolutions calling for audit of the financial records of the church and for termination of the services of Reid as pastor. The adherents filed an answer asserting that the court lacked jurisdiction of a controversy involving the internal governance of a church due to the Free Exercise clause of the First Amendment. The court, by order entered January 14, 1983, overruled this objection and ordered all parties to hold a congregational meeting on March 31, 1983, to consider the above resolutions and to conduct any other proper business. The order also enjoined Reid from installing officers, ordaining deacons, and setting up an "Executive Council" to govern the church until the congregational meeting had been held.

Ignoring the court's order, Reid convened a "special meeting" of the congregation on January 30, 1983, without giving the customary notice. On motion of the dissenters, the court, on March 7, 1983, held the January 30 meeting invalid for lack of proper notice and declared all actions taken at the meeting void. The court set March 10, 1983 as a new date for the congregational meeting. The court-ordered meeting was not held because, in addition to federal proceedings,[3] the adherents noted appeals to this Court from the orders of January 14 and March 7. The trial court enjoined any further action in the case pending appeal. We refused the adherents' petition for appeal on January 12, 1984.

At the January 30, 1983 meeting, later held void for inadequate notice, Reid purported to "silence" eighteen dissenters, including Gholson, forbidding them to speak or vote at that or any subsequent meeting. Thereafter, Reid called a "special meeting" of the congregation on May 8, 1983. There, various controversial mat-

---

[2] *Towns, et al.* v. *Reid, et al.*, Chancery No. C 82-1860.

[3] On February 28, 1983, the adherents filed a motion in the United States District Court for removal of the case to that court. The District Court dismissed the case by order entered March 30, 1983.

ters were discussed, including the proposal, advocated by the adherents, to erect a twelve million dollar "senior citizens home" on church-owned land, to be called "Calvary Towers." Notwithstanding the "silencing" of certain dissenters, the dissenters won the support of a majority of those present and voting. Reid delayed announcing the results of the voting for two hours, during which time "absentee cards" were produced from church members not present. Although absentee or proxy voting had never been authorized by the congregation, and was contrary to its custom, Reid announced that, with the addition of the absentee ballots, the adherents had won.

In September 1983, Reid mailed a notice to the members that the annual meeting of the congregation would be held on Thursday, October 27, 1983. At that meeting, the primary item on the agenda was to be the adoption of a written constitution for the church. The proposed constitution would terminate the congregation's right to vote on all controversial matters; instead, such matters would be decided by an "Executive Council." The constitution also would permit the "termination" of a person's membership at any meeting without prior notice. Under the proposed constitution and by-laws, control over the church property "and other responsibilities as may be assigned" were to be vested in a "Property Chairperson." The status of the court-appointed trustees was unclear; the proposed constitution did not mention them.

Under date of October 24, three days before the meeting, Reid mailed letters to Gholson and 62 other dissenters, informing them that they were "not certified to participate in the Annual Meeting because of disciplinary action by the church." The letters enclosed a copy of a purported "Code of Conduct," which stated that it had been adopted by "The Executive Council, and the Minister, Milton, the Disciple."[4] The "Code of Conduct" provided that members not "certified by the church office," members "silenced by the church," and "members whose actions violate the spirit of the Church Covenant" would not be permitted to participate in the meeting. The Code also promised silencing, after warning, to "[a]ny member who disregards or disrespects the chair."

---

[4] The record does not disclose any action by the congregation authorizing or electing an Executive Council. If such a council was appointed by Reid, it was apparently done in violation of the January 14, 1983 injunction in *Towns, et al.* v. *Reid, et al.*

On October 21, 1983, Gholson and Lewis, for the dissenters, filed this suit[5] by bill in equity in the circuit court. Reciting the undemocratic proceedings of the adherents in the past, they asked for the appointment of a Special Commissioner to "run and oversee" the proposed congregational meeting "in the interest of having a fair and impartial annual meeting." The case was set for hearing on the morning of October 27, but at 9:34 a.m. on that day, the adherents filed a petition for removal to the United States District Court, invoking 28 U.S.C. 1446.[6] After a hearing, the federal court determined that it had no jurisdiction and entered an order at 2:00 p.m. on October 27, remanding the case to the circuit court. After conferring with the judge of the circuit court, the United States District judge instructed counsel to appear in the circuit court at 3:00 p.m.

At 3:00 p.m. on October 27, the circuit court heard evidence and received exhibits filed by the dissenters. Notwithstanding their direct, personal notice of the hearing, neither the adherents nor their counsel appeared.

The court made the following findings: (1) At the proposed congregational meeting, the members would be called upon to decide the right, title, and control of all property held in trust for the congregation, that both civil and property rights were involved, and that substantial justice would be promoted by a fair and impartial meeting; (2) that the adherents proposed to adopt, at the meeting, a constitution which would divest the trustees of title to the church property and vest the same in a "Property Chairperson," and which would take from the congregation its right to resolve any controversy concerning church property; (3) that the adherents were charged with having conducted the undemocratic proceedings described above, which, if persisted in, would result in an unfair and partial annual meeting; (4) that the court was not required to resolve any ecclesiastical issues; and (5) that the civil and property rights in dispute could be resolved by the use of neutral principles of law, without violating the First Amendment.

The court granted the petition for appointment of a Special Commissioner to "run and oversee" the annual meeting, to take an accurate count of the voting, and to make a report to the court of the results, including "any irregularities that may occur." The

---

[5] *Gholson, et al.* v. *Reid, et al.*, Chancery No. C 83-1705.

[6] *Gholson, et al.* v. *Reid, et al.*, Civil Action No. 83-720-N.

dissenters nominated William Mazel, a commissioner in chancery, for this duty. He accepted and was appointed. The court also designated a deputy sheriff to accompany the commissioner and to "receive such orders from him as appear necessary."

The meeting scheduled for October 27 was not held. Instead, the adherents filed a petition to enjoin Commissioner Mazel from "interfering with the ecclesiastical and internal government of the said congregation." The court held a hearing on November 23 on this motion, at which both sides presented evidence. On December 19, 1983, the court entered an order denying the adherents' prayer for injunction. On August 16, 1984, we granted adherents an appeal from that order.[7]

Before the appeal had been granted, the Commissioner gave notice to all parties that he would hold a hearing on January 12, 1984, to determine guidelines for fair and orderly procedures to be used in calling and conducting a congregational meeting. Neither the adherents nor their counsel appeared at the hearing. Thereafter, on January 31, 1984, pursuant to notice, the Commissioner presented his proposed guidelines to the court for incorporation into an order. The adherents and their counsel again failed to attend the hearing. The court entered an order on January 31, incorporating the Commissioner's suggested procedures. The order directed the adherents to produce before the Commissioner, with copy to the dissenters, a membership list of the church congregation as of November 30, 1983.

When the adherents failed to produce a membership list, a "show cause" order was entered against them on February 17, 1984.[8] On March 7, after notice, the court gave the adherents un-

---

[7] The adherents applied to this Court for injunctive relief under Code § 8.01-626. That application was denied as untimely on January 12, 1984.

[8] On March 6, 1984, the adherents applied to the United States District Court (*Reid, et al.* v. *Mazel, et al.*, Civil Action No. 84-114-N) to enjoin Commissioner Mazel from supervising the congregational meeting, on First Amendment grounds, pursuant to 42 U.S.C. § 1983. The transcript of that proceeding has been made a part of the record on this appeal. It discloses that although the adherents argued on brief that they were victims of racial discrimination by the proposed actions of the Commissioner (he was white and they were black), that argument was expressly abandoned by their counsel at the hearing. The District Court denied the adherents' petition on two grounds: (1) the parties and issues were substantially the same as in Civil Action No. 83-720-N, which had been dismissed for lack of federal jurisdiction and not appealed, and therefore *res judicata*, and (2) the federal courts would not presume that the state courts would decide the case other than in conformity with the Constitution. This decision was appealed to the United States Court of Appeals for the Fourth Circuit, which, on July 19, 1984, overruled Commissioner Mazel's

til March 9 to produce the membership list. Upon their failure to comply, the court entered a further show cause order against them on March 12.

Still refusing to produce the membership list, the adherents called a special meeting of the congregation to be held on March 18, to adopt the proposed constitution and by-laws. On March 15, the court entered an order, on the dissenters' motion, enjoining the holding of a meeting until the court's prior orders had been obeyed.[9]

By orders entered on March 22, March 30, April 12, and May 18, the court found Reid and certain adherents in contempt, imposed fines and entered judgments thereon. Those rulings are not before us in the present appeal.

On April 8, the adherents purported to conduct an annual meeting in violation of the prior orders of the court.[10] The proposed constitution evidently received a majority of the votes cast at the meeting. On April 12, the court entered an order declaring all proceedings at this meeting void. Also, on April 12, the court entered a protective order, designating the membership list, when and if produced, as "confidential material" and providing detailed safeguards for its handling.

The record indicates that no membership list has yet been produced, that no congregational meeting has yet been held under the supervision of the Special Commissioner, and that the church is being governed by the "Executive Council," in violation of the trial court's orders, pending decision in this case.

---

motion to dismiss the appeal, but withheld decision pending further developments in the present appeal in the Virginia courts.

[9] On March 16, we refused the adherents' motion, made under Code § 8.01-626, to dissolve the injunction.

[10] The notice of this meeting was contained in a newsletter of April 1. It contained the following exhortation:

*Efforts will probably take place to enjoin [the April 8] meeting. The meeting will be held regardless of an injunction.* Every time we attempt to call a meeting, the dissidents try to block it. Whether the Pastor is in jail for obeying the church, the people of God rather than a corrupt order of the court that has no jurisdiction in the operation of church affairs or not, the meeting must proceed. God will be present. In the twelve times that I have been to jail; in Virginia, North Carolina, Georgia, and Alabama, every judge and every arresting officer who had anything to do with it are dead!!!!!!!!

## II. RELIGIOUS FREEDOM AND THE COURTS.

The constitutional guarantees of religious freedom have no deeper roots than in Virginia, where they originated,[11] and nowhere have they been more scrupulously observed.[12] These principles prohibit the civil courts from resolving ecclesiastical disputes which depend upon inquiry into questions of faith or doctrine. *Presbyterian Church* v. *Hull Church*, 393 U.S. 440 (1969). The courts have, however, frequently been called upon to resolve disputes concerning the civil and property rights of religious bodies and church members. In such cases, there is a danger that the power of the state may be called upon to aid a faction espousing a particular doctrinal belief, or to "become entangled in essentially religious controversies." *Serbian Eastern Orthodox Diocese, etc.* v. *Milivojevich*, 426 U.S. 696, 709 (1976). For this reason, "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Presbyterian Church* v. *Hull Church*, 393 U.S. at 449.

The threshold inquiry for a court asked to resolve such a dispute must be whether its resolution will project the fact-finder into what the Supreme Court, in *Serbian Eastern Orthodox Diocese*, aptly called a "religious thicket." 426 U.S. at 719. But where church property and civil rights disputes can be decided without reference to questions of faith and doctrine, there is no constitutional prohibition against their resolution by the civil courts. *Jones* v. *Wolf*, 443 U.S. 595 (1979); *Maryland & Va. Churches* v. *Sharpsburg Church*, 396 U.S. 367 (1970); *Presbyterian Church* v. *Hull Church, supra*; *Presbytery* v. *Grace Covenant Church*, 214 Va. 500, 201 S.E.2d 752 (1974); *Carr* v. *Union Church of Hopewell*, 186 Va. 411, 42 S.E.2d 840 (1947). "Civil courts do not inhibit free exercise of religion merely by opening their doors

---

[11] For a notable discussion of the evolution of James Madison's religious freedom clause of the First Amendment, from George Mason's Virginia Declaration of Rights (1776), through Thomas Jefferson's Bill for Establishing Religious Freedom (introduced 1779, enacted 1786, ultimately incorporated into the Constitution of 1830, art. III, § 11, appearing in the present Constitution as part of art. I, § 16), see *Everson* v. *Board of Education*, 330 U.S. 1, 11-13 (majority opinion) and 33-42 (Rutledge, J., dissenting) (1946).

[12] Because of this strong tradition, we have, for instance, refused to adopt the "implied trust" theory in favor of hierarchical churches, *Presbytery* v. *Grace Covenant Church*, 214 Va. 500, 201 S.E.2d 752 (1974), notwithstanding its acceptance by the federal courts and by the majority of our sister states, and we have refused to apply the traditional chancery doctrine of judicial *cy-pres*, in favor of religious trusts for indefinite beneficiaries. *Gallego's Ex'ors.* v. *The Attorney General*, 30 Va. (3 Leigh) 450, 24 Am. Dec. 650 (1832).

to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Presbyterian Church v. Hull Church*, 393 U.S. at 449. Neither the State Constitution nor the First Amendment deprives church members of their right to resort to the courts for the protection of their property rights, *Atkins v. Walker*, 284 N.C. 306, 200 S.E.2d 641 (1973), or their civil rights, *Abyssinia Missionary Baptist Ch. v. Nixon*, 340 So.2d 746 (Ala. 1976). The question is simply whether the court can decide the case by reference to neutral principles of law, without reference to issues of faith and doctrine.

## III. CHURCH GOVERNANCE AND THE COURTS.

Here, the adherents make no contention that there exists any doctrinal dispute between the contending factions, nor does the record disclose the slightest disagreement among the members of the church in matters of religious belief. Rather, the adherents argue that any judicial inquiry into "church governance," and particularly the appointment of a court officer to "run and oversee" a church meeting, is in itself an unwarranted intrusion by the civil authority into an ecclesiastical area constitutionally exempt from state control. This contention requires analysis in light of the distinction between hierarchical and congregational churches.[13]

## A. HIERARCHICAL CHURCHES.

Hierarchical churches may, and customarily do, establish their own rules for discipline and internal government. They may, and frequently do, establish internal tribunals to decide internal disputes arising in matters of discipline and internal government. These tribunals may be guided by a body of internally-developed canon or ecclesiastical law, sometimes developed over a period of centuries. The decisions of such tribunals may be promulgated as matters of faith and are entirely independent of civil authority. One who becomes a member of such a church, by subscribing to

---

[13] For this purpose, the term "hierarchical" includes "super congregational" and "connectional" churches. The distinctions drawn by these terms are immaterial to the subject considered here. "Congregational," which for this purpose includes "independent" churches, is used here merely to describe a religious organization which is governed only by its own congregation and is not subject to any external control.

its discipline and beliefs, accepts its internal rules and the decisions of its tribunals. For that reason, the civil courts will treat a decision by a governing body or internal tribunal of an hierarchical church as an ecclesiastical determination constitutionally immune from judicial review. To do otherwise would precipitate the civil court into the "religious thicket" of reviewing questions of faith and doctrine even when the issue is merely one of internal governance, because in such churches the resolution of internal government disputes depends upon matters of faith and doctrine. *Serbian Eastern Orthodox Diocese*, 426 U.S. at 724-25; *see also Green* v. *Lewis*, 221 Va. 547, 272 S.E.2d 181 (1980).

## B. CONGREGATIONAL CHURCHES.

█ Congregational churches, on the other hand, are governed by the will of the majority. *Abyssinia Missionary Baptist Ch.* v. *Nixon*, 340 So.2d 746 (Ala. 1976); *Holiman* v. *Dovers*, 236 Ark. 211, 366 S.W.2d 197, *supp. op. on reh'g.*, 236 Ark. 460, 366 S.W.2d 203 (1963); *Atkins* v. *Walker*, 284 N.C. 306, 200 S.E.2d 641 (1973). They are free to adopt constitutions, by-laws, and internal rules which will alter or regulate their proceedings, but even these must be enacted by majority vote. And in the absence of such voluntarily-adopted rules, each such congregation functions as a pure democracy. When the majority has spoken in a fairly-conducted congregational meeting held after proper notice to the membership, then the governing body of the church has expressed its will and, as in the case of an hierarchical church, its decision is constitutionally immune from judicial review.

█ The situation is otherwise, however, when the members of a congregational church merely seek the protection of the court for the purpose of obtaining a fairly-conducted meeting in the first place. Here the analogy to hierarchical churches breaks down because there is no body of ecclesiastical law to invoke, no internal tribunal to appeal to. A member of a congregational church, seeking the aid of the court in protecting his civil and property rights, may appeal only to the simple and fundamental principles of democratic government which are universally accepted in our society. These principles include the right to reasonable notice, the right to attend and advocate one's views, and the right to an honest count of the votes. Such rights are fundamental to our notions of due process. They are neutral principles of law, applicable not only to religious bodies, but to public and private lay organizations and to

civil governments as well. Courts must apply them every day, and can do so without any danger of entering a "religious thicket." Therefore, the authorities which preclude the courts from examining whether an hierarchical church correctly followed its own internal procedures, or correctly applied its canon law, are inapposite to the question before us.

## IV. RIGHTS.

■ The unrefuted evidence presented by the dissenters[14] makes a clear showing of a continuing course of conduct by Reid and his adherents to obstruct the dissenters in the exercise of their civil rights mentioned above. They have been persistently "silenced" and excluded from voting. Meetings have been called upon improper notice, votes favorable to the dissenters suppressed, and unauthorized absentee ballots counted against them. All efforts by the court to enable the congregation to hold a free and fair meeting, in which the majority could express its will, have been ignored.

■ It is also apparent that the dissenters' property rights, as well as their civil rights, are threatened by the adherents' proceedings. The proposed constitution purports to remove control of the church property from the congregation's elected trustees and to vest it in a "property chairperson." It removes all authority of the congregation to vote on property matters, and indeed on any "matter of controversy," and vests sole authority in an "Executive Council." The council would take over "matters of church discipline" and would itself become the "membership committee" and "the administrative body" of the church. The pastor becomes "the executive officer of the church." The pastor may only be removed on recommendation of the executive council. The constitution is silent as to how, and by whom, the members of the executive council are to be selected.

■ We therefore conclude that the dissenters have presented a proper case for the intervention of an equity court for the protection of their civil and property rights, and that such intervention does not infringe the guarantees of religious freedom contained in

---

[14] At all hearings which have been made a part of this record, the adherents either presented no evidence or failed to attend. Thus, the only state of facts before us is that which is stipulated or was adduced by the dissenters.

art. I, § 16 of the Constitution of Virginia and in the First Amendment to the Constitution of the United States.

## V. REMEDIES.

The adherents conceded in oral argument at the bar of this Court that the trial court might properly appoint a commissioner to attend a congregational meeting as an observer, with authority to report to the court thereafter. They contend, however, that authorizing the commissioner to "run and oversee" the meeting is too intrusive an assertion of judicial power into the exercise of religion to comport with the constitutional guarantees. They argue that the interface between civil authority and religious freedom occurs in such a sensitive area that the court should fashion the least intrusive remedy which would avail to protect the dissenters' rights. This could be accomplished, the adherents say, in either of two ways: (1) the dissenters could attend a meeting, abide the result, call for a "division" of the membership, and then apply to the court for allocation of the church property to the winning faction under Code § 57-9;[16] or (2) the commissioner could attend the congregational meeting as an observer and report any irregularities to the court, which could, if it found the irregularities to be substantial, invalidate the meeting, order a new meeting, and start over.

We agree that the role of the court in resolving disputes in this area is circumscribed by the constitutional guarantees of reli-

[16] § 57-9. How property rights determined on division of church or society.—If a division has heretofore occurred or shall hereafter occur in a church or religious society, to which any such congregation is attached, the communicants, pewholders, and pewowners of such congregation, over eighteen years of age, may, by a vote of a majority of the whole number, determine to which branch of the church or society such congregation shall thereafter belong. Such determination shall be reported to the circuit court of the county, or circuit or corporation court of the city, wherein the property held in trust for such congregation or the greater part thereof is; and if the determination be approved by the court, it shall be so entered in its chancery order book, and shall be conclusive as to the title to and control of any property held in trust for such congregation, and be respected and enforced accordingly in all of the courts of this State. If a division has heretofore occurred or shall hereafter occur in a congregation, which in its organization and government is a church or society entirely independent of any other church or general society, a majority of the members of such congregation, entitled to vote by its constitution as existing at the time of the division, or where it has no written constitution, entitled to vote by its ordinary practice of custom, may decide the right, title and control of all property held in trust for such congregation. Their decision shall be reported to such court, and if approved by it, shall be so entered as aforesaid, and shall be final as to such right of property so held.

gious freedom, and that a court must exercise great restraint in this area, but we do not think the trial court exceeded its proper sphere in this case. The remedy afforded by Code § 57-9 is clearly inadequate in the dissenters' situation. They have expressed no desire to separate from the body of their church, or to rend it into groups, each of which seeks to take over all the property and characterize the other as apostate, excommunicated, and outcast. But they must create such a division as a prerequisite to relief under § 57-9. Further, the statute provides that the "constitution as existing at the time of the division" shall determine the eligibility of members to vote. If the constitution is put into force without permitting them to vote on its adoption, and it will by its terms provide for their disfranchisement, the remedy provided by the statute would be a mirage, which fades if pursued.

There may, indeed, be cases in which the court should begin with a more cautious exercise of its power, appointing an observer initially, and proceeding to stronger remedies only if the first steps prove futile, but this is surely not such a case. Counsel represented to the federal court on October 27, 1983, that they had been trying for two years to secure agreement of the factions to name some impartial person to preside at a congregational meeting, but that the bitterness of the dispute precluded agreement. The federal judge requested counsel to continue their efforts to negotiate such an agreement, and they promised to use their best efforts, but these have evidently been unavailing. As stated above, Reid and his adherents have established a consistent track record of truculent defiance, not only toward the dissenters, but also toward all judicial proceedings that have affected them. There is no requirement that the court restrict its intervention to the obviously futile exercise of appointing an observer, receiving his report, invalidating a meeting, appointing another observer, receiving his report, invalidating another meeting, *ad infinitum.* Any objective analysis of the record before us indicates that such a scenario would be the probable outcome if the court did no more than appoint an observer.

There is precedent for the appointment of a judicial officer to oversee a congregational meeting, and actually to preside, if necessary, in a proper case. *Burnett* v. *Banks*, 130 Cal. App.2d 631, 279 P.2d 579 (1955); *Willis* v. *Davis*, 323 S.W.2d 847 (Ky. Ct. App. 1959); *Horodeckyi* v. *Horodniak*, 16 Misc.2d 865, 182 N.Y.S.2d 280 (1958); *Waters* v. *Hargest*, 593 S.W.2d 364 (Tex.

Civ. App. 1979). We hold that the trial court's action was fully justified by the record before us. The order appealed from will be

*Affirmed.*

THOMAS, J., concurring in part and dissenting in part.

The majority opinion is important for the guidance of our courts and our citizens. It confirms, and rightly so, the power of the courts to intervene in church-based disputes where property rights and civil rights of church members are threatened. I agree with virtually all of what the majority has written. However, I think that this Court should not have approved the remedy devised by the trial court as the threshold response to this delicate problem.

The trial court appointed a Commissioner in Chancery and a uniformed deputy to, in effect, take over the operation of the church meeting. That such a remedy might ultimately be required I do not dispute. However, I think that what happened here was far too intrusive as a first-level response. The trial court should have shown more restraint. The majority opinion should have made clear to the trial courts that where courts are called upon to intervene in church disputes the overriding principle in the area of remedies must be restraint.

Religious freedom is one of the reasons for the existence of the United States. Many of our ancestors overcame great hazards to reach the freedoms offered by our shores. It is only fitting and proper then that courts in America should be cautious, careful, and restrained when called upon to use the secular power of the state to resolve disputes that rage within churches. Without such caution, the brute strength of the state could inadvertently trample upon the delicate balance struck by our founding fathers between issues of church and issues of state.

The majority's description of the powers of the Commissioner is incomplete. He certainly was empowered to "run and oversee" the church meeting, to count the vote, and to report to the court. But his powers went further than that. He was directed by the trial court to limit voting to church members over the age of eighteen. He was empowered to decide who qualified as a church member and who did not. He was authorized to select a presiding officer or to preside himself. He was directed by the trial court to limit all speaking to five minutes per person. He was permitted to select

tellers to assist in vote counting. He was granted sole discretion, in the event the business was not concluded in one meeting, to call another meeting at a time and place he deemed appropriate.

In short, as a first response to this dispute, the trial court ordered that the church meeting be taken over and run by the state. This remedy was much more than necessary. The majority concedes that in cases of this kind the courts "must exercise great restraint." Yet, the majority approved this intrusive remedy as a threshold response to this dispute. The majority says this remedy was justified for at least three reasons: First, because the minister and his adherents had established a track record of truculent defiance; second, because the disputing factions could not agree upon an impartial person to run the meeting; and third, because the court might have started itself along an endless path of appointing observers, invalidating improper meeting results, then appointing another observer. These explanations are insufficient to me to justify the level of intrusion that was ordered by the trial court.

In almost every church case that makes its way into the courts, the parties will be sharply divided and in hot debate. At least one side to the dispute is likely to believe that separation of church and state means that the courts have no role to play in church affairs. Such a belief may manifest itself in a defiant attitude. The courts, of course, will not condone such an attitude, however, its existence does not automatically mean that the remedy fashioned by the court should be any less restrained than it would have been had all the litigants been cheerful and pleasant. I am more concerned with striking the proper balance between church and state than showing a defiant minister the full scope of a trial court's power; this is surely true at the threshold.

I think the appropriate remedy would have been to send in the Commissioner as the "eyes and ears" of the court but otherwise to allow the church to operate as it customarily operated. This means that if the minister normally presides at a church meeting let him preside — under the watchful eye of the court. The selection of an impartial person to run the church meeting would not be necessary under my threshold approach to this problem. The Commissioner would have a passive role to observe and report back to the court. If the report is that the events leading up to the meeting, e.g., notice, and the conduct of the meeting, e.g., speaking and voting, were fair, then the court could step aside. If the report is otherwise, the court could fashion a more intrusive remedy.

By my approach, there is no risk that the court would embroil itself in a never ending series of appointments of passive observers. If given the chance to conduct a fair meeting under the eyes and ears of the court the minister fails to do so, he would have to face escalating intrusions until a fair meeting was conducted.

My approach would pay proper respect to religious freedom and to the power of the courts to intervene in disputes of this kind. It would make the trial courts start with the least intrusive remedy and move up notch by notch to more intrusive remedies. My approach would make restraint the guiding principle in resolving church-based disputes.

Although this one dissent cannot change the majority result, I hope the trial courts will not take the majority opinion to mean that wherever there exists a serious dispute within a church, that it is proper to send a Commissioner and a deputy into the sanctuary to take charge. Such a first-level remedy gives rough treatment to so precious and delicate a right as freedom of religion.