Present:  Hassell, C.J., Koontz, Kinser, and Millette, JJ.,
and Lacy, S.J.

THE PROTESTANT EPISCOPAL CHURCH
IN THE DIOCESE OF VIRGINIA

v.  Record No. 090682


TRURO CHURCH, ET AL.                        OPINION BY
                                   JUSTICE LAWRENCE L. KOONTZ, JR.
THE EPISCOPAL CHURCH                      June 10, 2010

v.  Record No.  090683

TRURO CHURCH, ET AL.

              FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                       Randy I. Bellows, Judge


     These appeals arise from a dispute concerning church

property between a hierarchical church and one of its dioceses

in Virginia and a number of the diocese's constituent

congregations.  The principal issue we must decide is whether

under the specific facts of these cases Code § 57-9(A)

authorized the congregations to file petitions in the

appropriate circuit courts for entry of orders permitting them

to continue to occupy and control real property held in trust

for the congregations after voting to disaffiliate from the

church and affiliate with another polity.[1]

---

     [1] When used in reference to religious entities, the term
"polity" refers to the internal structural governance of the
denomination.  See, e.g., Note, Judicial Intervention in

BACKGROUND

While the consolidated record in these cases is voluminous, we need recite only those facts necessary to our resolution of the dispositive issue of whether the circuit court correctly ruled that Code § 57-9(A) is applicable to the specific facts in these cases.[2]  See, e.g., Asplundh Tree Expert Co. v. Pacific Employers Ins. Co., 269 Va. 399, 402, 611 S.E.2d 531, 532 (2005).  Because the resolution of these appeals requires us to construe the language of Code § 57-9(A), we will set out that language here so that the relationship of the recited facts to the issues to be resolved will be clear:[3]

> If a division has heretofore occurred or shall hereafter occur in a church or religious society, to which any such congregation whose property is held by trustees is attached, the members of such

---

Disputes Over the Use of Church Property, 75 Harv.L.Rev. 1142, 1143-44 (1962).

[2] An extended period of discovery, a six-day ore tenus hearing with witnesses, and many subsidiary hearings before the circuit court generated a manuscript record of over 8000 pages, many thousands of transcript pages of testimony and argument, and copious exhibits.

[3] The original statute addressing how property rights are to be determined upon a division within a church or religious society was adopted by the General Assembly in 1867.  1866-67 Acts ch. 210.  Although the statute has been reenacted and amended several times during the past 150 years, the most significant change being to create separate subsections for its application to hierarchical and congregational churches, 2005 Acts ch. 772, the operative language of the statute construed by the circuit court, and which is the focus of our discussion in these appeals, has remained unchanged.

congregation over 18 years of age may, by a vote of a majority of the whole number, determine to which branch of the church or society such congregation shall thereafter belong.  Such determination shall be reported to the circuit court of the county or city, wherein the property held in trust for such congregation or the greater part thereof is; and if the determination be approved by the court, it shall be so entered in the court's civil order book, and shall be conclusive as to the title to and control of any property held in trust for such congregation, and be respected and enforced accordingly in all of the courts of the Commonwealth.

The Ecclesiastical Relationships Among the Parties

We have previously held that Code § 57-9(A) applies to congregations of "hierarchical churches," that is "churches, such as Episcopal and Presbyterian churches, that are subject to control by super-congregational bodies."[4]  Baber v. Caldwell, 207 Va. 694, 698, 152 S.E.2d 23, 26 (1967).  The dispute that resulted in the litigation from which these appeals arise involves a complex interplay between various entities within a faith community that has local, national, and international ties.  It is not disputed that the entities involved in this litigation are part of a hierarchical church, although the parties differ on which entities compose that

_____

[4] Code § 57-9(B) authorizes a circuit court to approve a vote concerning the use and control of property held in trust for the benefit of an autonomous congregation not affiliated with a hierarchical church.  The parties stipulated in the circuit court that the petitioning congregations were "not, in their organizations and governments, entirely independent of

3

church.  In order to better understand the context in which the dispute arose, we will first identify the entities involved and their relationship to one another.

The Anglican Communion is an international body that consists of 38 "provinces," which are "regional and national churches that share a common history of their understanding of the Church catholic through the See of Canterbury" in England. The Archbishop of Canterbury is the head of the Church of England, one of the national churches within the Anglican Communion, and is considered the "chief pastor," "first among equals in the wider Anglican Communion," and the "focus of the unity" within the leadership in the Anglican Communion.

The Anglican Communion functions through three "instruments of unity":  the decennial Lambeth Conference; the Anglican Consultative Council, which meets every two or three years; and the biennial Primates' Meeting.  The Lambeth Conference is the oldest of these institutions, dating from 1867.  Participation in the Lambeth Conference is by "invitation only" from the Archbishop of Canterbury, with invitations being directed to individual church bishops and other leaders among the clergy, not to regional or national churches as a unit.  Although the Lambeth Conference issues

any other church or general society" and, thus, Code § 57-9(B)

resolutions and reports, these are not binding on the regional and national churches.  Rather, the function of the Lambeth Conference and the other international activities of the Anglican Communion are "primarily consultative."  Thus, any action within the Anglican Communion has efficacy within a regional or national church only if the church adopts the resolution or report through its own polity structure for the governance of that church.

The Episcopal Church ("TEC") is a province of the Anglican Communion and the principal national church following the Anglican tradition within the United States.[5]  TEC consists of 111 geographical dioceses with over 7000 congregations and over 2 million members.  The highest governing body of TEC is the triennial General Convention, which adopts TEC's constitution and canons to which the dioceses must give an "unqualified accession."  Each diocese in turn is governed by a Bishop and Annual Council that adopts the constitution and canons for the diocese.  Each congregation within a diocese in turn is bound by the national and diocesan constitutions and

would not apply to the facts of these cases.

[5] TEC is also known by the longer form "The Protestant Episcopal Church in the United States of America," and was identified as such, and by the acronym "ECUSA," in the circuit court.  We have adopted the form used in the style of the appeal brought by TEC and by the parties in briefing both appeals.

5

canons.  The Protestant Episcopal Church in the Diocese of Virginia ("the Diocese") is one of the dioceses within TEC.[6]

Priests of TEC are "canonically resident" within a specific diocese and may not function as priests in any other diocese of TEC without the permission of the local bishop. Similarly, a priest ordained by a diocese of TEC may not function as a priest for one of the other regional or national churches that participate in the Anglican Communion without permission from the local authority of that church.

At the 2003 General Convention of TEC, three major points of controversy arose:  the Convention's confirmation of the election of Gene Robinson, a homosexual priest, as a bishop of one of the dioceses of TEC; the adoption of a resolution permitting the blessing of same-sex unions; and the rejection of a resolution concerning the "historic formularies of the Christian faith."  Following the 2003 General Convention, Peter James Lee, the bishop of the Diocese, who had supported the confirmation of Robinson as a bishop, received "hundreds of letters" opposing these actions taken by the General Convention.  Additionally, several congregations opposed to the actions of the General Convention stopped paying pledges

---

[6] There are three dioceses affiliated with TEC in Virginia.  The "Diocese of Virginia" consists of 38 counties in the northern and central parts of the Commonwealth.

owed to the Diocese and TEC, placing the funds in escrow.  As a result, Bishop Lee became concerned that the dissident congregations would "attempt to create a parallel province."

In response to the discord within the Diocese, in 2004 a "Reconciliation Commission" was formed "to find ways to bring about some peaceful conflict resolution."  Despite this effort, dissent concerning the actions of the 2003 General Convention continued, and in 2005 Bishop Lee created a new commission "to give attention to this rising threat of division in the Diocese."  The following year, the commission promulgated a "Protocol for Departing Congregations."  Under this protocol, the Diocese initiated procedures for congregations to conduct votes "regarding possible departure from the Diocese," and several congregations initiated procedures under the protocol to separate from the Diocese. However, Bishop Lee subsequently advised leaders of the dissident congregations that due to a change in leadership in TEC, separation of congregations had become a matter of concern to the national church, and that a vote to separate would not be binding on the Diocese or TEC.

Nonetheless, between December 2006 and November 2007, 15 congregations voted to separate from the Diocese.  As a result, 22 members of the clergy associated with these congregations were deposed, or removed, from their pastoral

7

duties in the Diocese by Bishop Lee. Congregations in other dioceses of TEC also took similar action to separate from their dioceses over the controversies arising from the 2003 General Convention. These congregations, as well as newly formed congregations of former members of TEC, began seeking to affiliate with other polities within the Anglican Communion in order "to be a part of the worldwide church."

The Church of Nigeria is a province of the Anglican Communion and governs the Anglican churches in the Federal Republic of Nigeria, a former British colony. In 2005, the Convocation of Anglican Nigerians in America was established as a mission of the Church of Nigeria to provide oversight for expatriate Nigerian congregations in the United States. In 2006, the Church of Nigeria changed the name of this mission to the Convocation of Anglicans in North America ("CANA") and began accepting former TEC congregations. In 2006, the Anglican District of Virginia ("ADV") was formed as a district of CANA. By 2007, CANA included 60 congregations in eighteen states and 12,000 members, of which 10,000 were in congregations previously affiliated with dioceses of TEC. This action was viewed by the Archbishop of Canterbury and the leadership of TEC as an improper "incursion" of one member of the Anglican Communion on the territory of another member.

The leadership of TEC actively opposed the decision of the Nigerian Primate, Archbishop Peter J. Akinola, to install Rev. Martyn Minns, the Rector of one of the dissident congregations in the Diocese, as the bishop of CANA. In part because of this conflict, Archbishop Akinola made a declaration of "broken communion" with TEC. Although Archbishop Akinola installed Minns as the Bishop of CANA, Minns was not placed on the "invitation list" for the Lambeth Conference.

Procedural History

These appeals arise from petitions filed between December 2006 and July 2007 pursuant to Code § 57-9(A) by nine congregations formerly affiliated with the Diocese which now purport to be congregations within ADV and CANA ("the CANA Congregations").[7] The petitions were originally filed in the five circuit courts "wherein the property held in trust for [each] congregation or the greater part thereof" is located. Each congregation averred in its petition that a "division has

_____

[7] The nine congregations are The Church at the Falls – The Falls Church, in Arlington County; Truro Church, Church of the Apostles, and Church of the Epiphany, Herndon, in Fairfax County; St. Margaret's Church, Woodbridge, St. Paul's Church, Haymarket, and Church of the Word, Gainesville, in Prince William County; Church of Our Saviour at Oatlands, in Loudoun County; and St. Stephen's Church, Heathsville, in Northumberland County.

occurred at the international, national, and local levels" that "resulted from a profound theological break by TEC and the Diocese from the majority of the other provinces of the Anglican Communion." The congregations alleged that as a result of this division, they had "determined to disaffiliate from TEC and the Diocese and to reaffiliate with another branch of the Anglican Communion." Although the petitions did not expressly identify the "branch" with which the congregations proposed to affiliate, exhibits attached to the petitions identify it as the ADV as a constituent part of CANA, acknowledging that CANA is a part of the Church of Nigeria.

The Diocese and TEC intervened in these cases to oppose the granting of the petitions and also filed declaratory judgment actions against the CANA Congregations, seeking a determination of trust, proprietary, and contract rights, if any, that the Diocese and TEC had in the properties used by the CANA Congregations which were the subject of the Code § 57-9(A) petitions.[8] The CANA Congregations filed answers to

_____

[8] TEC filed a single complaint for declaratory judgment against the CANA Congregations along with two others, Christ the Redeemer Church and Potomac Falls Church; the Diocese filed individual complaints for declaratory judgment against the CANA Congregations and the two others. The congregations of Christ the Redeemer Church and Potomac Falls Church are not parties to these appeals.

10

the declaratory judgment actions as well as counterclaims seeking declaratory judgment in favor of the congregations, to which the Diocese and TEC filed answers.  A three-judge panel appointed by this Court under the Multiple Claimant Litigation Act, Code §§ 8.01-267.1, et seq., consolidated all these cases in the Circuit Court of Fairfax County.

Both TEC and the Diocese challenged the legitimacy of the CANA Congregations' petitions on multiple grounds.  Their threshold position, and the issue that is ultimately dispositive in these appeals, was that relief under Code § 57-9(A) is not available to the CANA Congregations because there has been no "division" within TEC or the Diocese and that, even if there had been, neither CANA nor the ADV is a "branch of the church" resulting from that division to which the congregations could, as contemplated by the statute, attach themselves.  The circuit court held a six-day evidentiary hearing to determine the scope and application of Code § 57-9(A) and, specifically under the facts of these cases, whether the statute would authorize the court to grant the requested relief to the petitioning congregations.

During this hearing, the CANA Congregations, TEC, and the Diocese presented extensive expert testimony regarding the enactment of Code § 57-9(A) and the history of divisions in religious denominations in Virginia.  The CANA Congregations'

11

experts testified that TEC had experienced a "division" because various congregations had separated from TEC in order to join a separate polity. In contrast, TEC's and the Diocese's experts testified that TEC could not divide without action by the General Convention, and therefore TEC had not experienced a "division" as a result of the underlying ecclesiastical differences. The experts also gave conflicting testimony as to whether the statutory terms "branch," "attached," and "church or religious society" were met by the situation presented. We will recount more fully the arguments of the parties and the evidence of the expert witnesses on these points subsequently in this opinion.

In a letter opinion dated April 3, 2008, the circuit court opined that the CANA Congregations had properly invoked Code § 57-9(A). The circuit court found the Diocese, TEC, and the Anglican Communion were all "church[es] or religious societ[ies]," and that CANA, the ADV, the Church of Nigeria, TEC, and the Diocese were all "branches" of the Anglican Communion for purposes of applying Code § 57-9(A). Likewise, the court reasoned that CANA and the ADV were also "branches" of TEC and the Diocese. Accordingly, the court concluded that the CANA Congregations were entitled to file petitions under Code § 57-9(A) in order to have the court determine "the title

12

to and control of any property held in trust" for the benefit of those congregations.

Following these rulings, the circuit court conducted further proceedings addressing constitutional challenges to Code § 57-9(A) raised by TEC and the Diocese under the establishment and free exercise clauses of the First Amendment of the United States Constitution and the equivalent provisions of the Virginia Constitution, as well as arguments concerning whether the statute violates principles of constitutional due process and the contracts clause. During this stage of the proceedings, the Commonwealth intervened for the purpose of defending the constitutionality of the statute.

On June 27, 2008, the circuit court issued a further letter opinion in which it upheld the constitutionality of the statute. Following additional proceedings, the court ultimately issued a final judgment on January 8, 2009 granting the CANA Congregations' petitions and dismissing TEC's and the Diocese's declaratory judgment actions as moot.[9] By orders

---

[9] The circuit court ruled that an endowment fund related to one of the CANA Congregations was held in corporate form and, thus, a determination of its ownership and control could not be decided under Code § 57-9(A). Accordingly, it ordered the resolution of the declaratory judgment actions with regard to the fund to be severed from the proceedings. This ruling has not been challenged by the effected congregation in these appeals. As relevant to the Diocese's appeal only, the court also determined that it lacked jurisdiction to consider a

13

dated November 9, 2009, we awarded appeals from this judgment to TEC and the Diocese.

DISCUSSION

Although the assignments of error in TEC's appeal and that of the Diocese are not entirely concordant, the two appeals broadly address the same principal themes in challenging the judgment of the circuit court with respect to its finding that Code § 57-9(A) is applicable to the facts in these cases and is not violative of the various constitutional principles argued below. Consistent with the analytical approach taken in the circuit court, we will first decide whether Code § 57-9(A) is applicable in these cases, only reaching the questions concerning the statute's constitutionality if necessary. Davenport v. Little-Bowser, 269 Va. 546, 557, 611 S.E.2d 366, 372 (2005).

The circuit court's rulings with respect to the applicability of Code § 57-9(A) are addressed in TEC's first three assignments of error:

> 1. The circuit court erred in interpreting and applying the term "division" in Va. Code § 57-9(A) and the statute itself to supersede the Episcopal Church's polity, because its interpretation ignores and conflicts with related Virginia statutory case law, the principle of Constitutional avoidance, and the statute's past application.

---

challenge to deeds transferring property to one of the CANA Congregations from another congregation of the Diocese.

14

2.  The circuit court erred in holding that CANA and the ADV are "branches" of the Episcopal Church or the Diocese of Virginia (the "Diocese") for purposes of § 57-9(A), because CANA and the ADV were formed by the Church of Nigeria, and because the court's holding impermissibly rested on its own finding of "communion."

3.  The circuit court erred in holding that the Anglican Communion satisfied § 57-9(A), because the Anglican Communion has not "divided," even under the court's definition of the term, and also is not a "church or religious society" to which the congregations were "attached."

The Diocese addresses the same issues within its third assignment of error:

The Circuit Court erred as a matter of law by holding that the requirements of Va. Code § 57-9(A) were satisfied in these cases.  That holding was error because the court adopted erroneous and entangling definitions of the statutory terms "division," "branch," and "attached," leading the court to err by holding that a "division" has occurred in the Anglican Communion, the Episcopal Church (the "Church" or "TEC"), and the Diocese of Virginia (the "Diocese"); that all relevant entities were "branches" of and "attached" to the Anglican Communion; and that the Convocation of Anglicans in North American [sic] ("CANA") and Anglican District of Virginia ("ADV") are "branches" of the Church and the Diocese.

While the issues raised by these assignments of error deal primarily with questions of statutory construction which are reviewed de novo, Smit v. Shippers' Choice of Va., Inc., 277 Va. 593, 597, 674 S.E.2d 842, 844 (2009), to the extent that we must also review the circuit court's application of a statute, we accord deference to the court's determinations of fact.  Virginia Baptist Homes, Inc. v. Botetourt County, 276

15

Va. 656, 663, 668 S.E.2d 119, 122 (2008). Accordingly, we will first consider de novo the meaning of the relevant terms in Code § 57-9(A), and then apply our construction of those terms to the circuit court's findings of fact to the extent that they remain applicable.

The circuit court's analysis of the applicability of Code § 57-9(A) focused on the meanings of the specific words "division," "church or religious society," "attached," and "branch" within the statute. The court considered each separately and ultimately concluded that, as they were not otherwise defined within the statute or elsewhere in the Code, each of these words was to be given its plain and ordinary meaning, taking into account the historical context of the enactment of the original predecessor statute. While the use of "plain and ordinary meaning" is, of course, a fundamental rule of statutory construction to be applied where a word or phrase is not otherwise defined by the Code, the rule also requires that the courts should be guided by " 'the context in which [the word or phrase] is used.' " Sansom v. Board of Supervisors, 257 Va. 589, 595, 514 S.E.2d 345, 349 (1999) (quoting Department of Taxation v. Orange-Madison Coop. Farm Serv., 220 Va. 655, 658, 261 S.E.2d 532, 533-34 (1980)).

When considered in the overall context of the statute, a proper construction of the language of Code § 57-9(A) must

16

take into account the interrelationship of the words being considered. Thus, in order to determine whether a congregation is entitled to petition for the relief afforded by Code § 57-9(A), as a prerequisite the congregation must show that there has been a "division . . . in a church or religious society[] to which any such congregation . . . is attached." Likewise, the authority afforded by the statute permitting such congregations to vote in order to determine "to which branch of the church or society such congregation shall thereafter belong" must be construed within the context of the first phrase of the statute. That is, the "branch of the church or society" to which the congregation votes to belong must be a branch of the "church or religious society[] to which [the petitioning congregation] is attached" prior to the "division." Accordingly, we will construe the language of these two phrases together in this related context.

Initially, we note that the parties to this litigation do not dispute that TEC and the Diocese are each a "church" as contemplated by the phrase "church or religious society" contained in Code § 57-9(A). The circuit court correctly found that such was true when applying the plain meaning of these terms. The circuit court also found that "it need not reach the question as to whether the Anglican Communion is in fact a 'church' under Code § 57-9(A), because there is

17

abundant evidence in the record . . . that the Anglican Communion is, at the very least, a 'religious society.' "

The clear purpose of Code § 57-9(A) is to provide a method by which the disputed title to and control of any property held in trust for a congregation may be conclusively determined.  The "church or religious society" referenced in the statute in which a "division" has occurred contemplates one that has an interest in the property for which the title and control is at issue.  TEC and the Diocese have asserted an interest in the property at issue in this litigation.  No such assertion is made by the Anglican Communion.  However, for purposes of our analysis in these appeals, we need not decide whether the Anglican Communion is a church or religious society as contemplated by Code § 57-9(A) because the evidence in the record does not establish that there has been a "division" in the Anglican Communion.  While undoubtedly there was theological disagreement between TEC and the Diocese and CANA, the ADV, the dissenting congregations and the Church of Nigeria concerning the actions of the 2003 General Convention of TEC, all of these entities continue to admit a strong allegiance to the Anglican Communion.  Accordingly, we conclude that the circuit court erred in its holding that there was a division in the Anglican Communion for purposes of the application of Code § 57-9(A) in these cases.

18

It then follows that the focus of our analysis in these appeals is whether the dissenting congregations have established that there had been a "division" in TEC and the Diocese, churches to which the congregations were "attached," and whether the congregations voted to belong to a "branch" of TEC and the Diocese. We first address the issue of a division in TEC and the Diocese.

As a prerequisite to a congregation being permitted to petition a circuit court to confirm the result of a vote to separate from a church to which it is attached as provided in Code § 57-9(A), the congregation must establish that there has been a "division" within that church. Indeed, the circuit court expressed the view that in order to resolve the issue of whether Code § 57-9(A) applied to the CANA Congregations' petitions it had to "address the question at the heart of this litigation: Has a division occurred?" Thus, much of the expert testimony presented by the parties was directed toward placing the concept of a "division" within a church into a historical context in an effort to establish the intention of the General Assembly when choosing this word in enacting the original predecessor statute to Code § 57-9 in 1867.

Dr. Mark Valeri, an expert witness for the CANA Congregations, testified that the most commonly understood definition of "division," as understood in the mid-19th

century, both nationally and specifically in Virginia, is the "separation out of the group of members of a religious . . . denomination in sufficient numbers to begin to form an alternative polity and the renunciation of the authority of the original group in that process." Further, Dr. Valeri stated that typically when a group left the particular denomination, it was not an amicable split, nor was it "with the approval or consent of the higher ecclesiastical authorities." Dr. Valeri highlighted several historical examples of this type of "division," agreeing that in these instances it was not the case that "the new group be acknowledged by the entity from which it divided in order to be viewed in common parlance as a branch."

The circuit court found that "[i]n sum, Dr. Valeri testified that the 'average, ordinary Virginian in 1867' would have understood 'division' to mean 'the separation out of a group in rejection of the authority [of that group],' and that 'it is that act of division which creates a branch.' This understanding would 'encompass situations in which the church or religious society' did not 'approve' of the [']division,' as well as situations in which the 'new entity, the new polity, was not formally affiliated with the church and religious society from which it divided.' "

Dr. Charles Irons, another expert for the CANA Congregations, testified that "the most common definition of division would be the fragmentation of one religious jurisdiction to create two or more jurisdictions." But there were "additional possible meanings of division" including "internal conflict or discord within a religious body. . . . Division could also be used to describe not the act of separation itself, but one of the resulting branches." Dr. Irons specifically noted that in reviewing prior cases involving petitions under the predecessor statutes to Code § 57-9(A), it was never alleged that the division had been approved by "higher ecclesiastical authorities," or that the filing of the petitions "had been approved by higher ecclesiastical authorities."

By contrast, Dr. Ian Douglas, an expert called for TEC and the Diocese, asserted that neither TEC nor a diocese of TEC could divide "without the action of [the] General Convention." Dr. Douglas further testified that "a congregation or a people can choose to leave a parish or leave the Episcopal Church," but that such action would "not fundamentally constitute a division or a departure of a parish . . . from the wider Episcopal Church."

Dr. Douglas opined that "there can be no division without formal approval of the division by the highest adjudicators of

21

the religious body involved." Dr. Douglas also testified that the term "division" as used in Code § 57-9(A) would not be applicable to the Anglican Communion because it was a "family of churches" with a shared historical relationship, but it was not an "intact whole" that would be subject to division.

Dr. Robert Bruce Mullen also testified for TEC and the Diocese. Dr. Mullen stated that in the context of hierarchical church structures "a division is usually understood as a formal separation of a larger religious body such that it looks markedly different after this has been done. Such that we might say that one body becomes two. . . . [I]t [is] a much more formal category than just simply an informal separation." According to Dr. Mullen, in the 19th century there would have been a distinction made "between a division [in] a denomination as a whole and a mere departure o[r] separation from that denomination."

After reviewing the conflicting testimony of these experts in its April 3, 2008 letter opinion, the circuit court stated that it found "the testimony of the two CANA congregation experts – Dr. Valeri and Dr. Irons – to be more persuasive and convincing." The court reasoned that these two experts had based their opinion on "the particular and pertinent historical record relevant to the instant case,"

22

while the opinions of the experts for TEC and the Diocese "did not appear to be so tethered."

The circuit court also reviewed the prior cases from this Court dealing with divisions within churches. The court recognized that Baber v. Caldwell, 207 Va. 694, 152 S.E.2d 23 (1967), and Reid v. Gholson, 229 Va. 179, 327 S.E.2d 107 (1985), involved divisions within autonomous congregations, not hierarchical churches, but nonetheless found that the discussion of the division that occurred in each case to be instructive. The court recognized that in Baber, "division" was described as "intra-congregational strife" and "dissension," which the circuit court took as supporting Dr. Valeri's contention "that a division need not be consensual or amicable." The court noted that in Reid this Court found that the requisite "division" had not occurred because the petitioners in that case "expressed no desire to separate from the body of their church, or to rend it into groups, each of which seeks to take over all the property and characterize the other as apostate, excommunicated, and outcast." 229 Va. at 192, 327 S.E.2d at 115.[10]

_____

[10] The circuit court also reviewed Brooke v. Shacklett, 54 Va. (13 Gratt.) 301 (1856), a case decided prior to the enactment of the original predecessor statute to Code § 57-9, but found that it was "not helpful precedent" because the decision in that case was "premised on a 'division' whose

The circuit court ultimately concluded that "the definition of 'division' as that term is used in [Code §] 57-9(A) is in fact that assigned to it by the CANA Congregations, which is '[a] split . . . or rupture in a religious denomination that involve[s] the separation of a group of congregations, clergy, or members from the church, and the formation of an alternative polity that disaffiliating members could join.'"  The court further concluded that the more restrictive definition proposed by TEC and the Diocese requiring a formal approval of a division by the consent of the hierarchical church "would make [Code §] 57-9(A) a nullity."  While agreeing with TEC and the Diocese "that division, under [Code §] 57-9(A), ought not be 'easy,'" the court opined that the definition it had adopted placed an appropriate burden on a petitioning congregation to show "three major and coordinated occurrences."  That is, a "split"

---

existence was not in serious dispute."  Similarly, the court concluded that Hoskinson v. Pusey, 73 Va. (32 Gratt.) 428 (1879), did not establish, as the CANA Congregations contended, that the statute did not "require that a division be recognized or approved by a denomination," finding that the absence of any express discussion of that issue beyond the fact that such was apparently the case in Hoskinson could mean that the "Court simply did not reach the issue."  Likewise, the court found that Finley v. Brent, 87 Va. 103, 12 S.E. 228 (1890), was decided "on other grounds" that did not require the Court to construe the meaning of division.

or "rupture" resulting in a separation from the church and the formation of or attachment to an alternative polity.

In addressing its first assignment of error, TEC contends that the circuit court erred in adopting this definition of division because it effectively would allow congregational majorities to "strip hierarchical churches of property rights in violation of denominational polity and rules." TEC contends that historically Code § 57-9(A) "was prompted by and has been applied only to divisions accomplished in conformity with denominational polity." Similarly, the Diocese contends within the argument of its third assignment of error that the "[c]ircuit [c]ourt's interpretation treats the separation of a small minority that form or join an alternative polity as a 'division,' ignoring the Church's hierarchical polity and rules and vesting control solely in local majorities." TEC disputes that its proposed construction of the term would render the statute a nullity because even in divisions formally recognized by the church, the statute would still be necessary to permit congregations to choose between the old and the new polities created by the division. We are not persuaded by these contentions.

Inherent in the concept that a division must be recognized through a formal process within the church's polity is that the courts would ultimately be drawn into an

ecclesiastical dispute to determine whether a division as contemplated by Code § 57-9(A) had occurred. Such a circumstance would risk entangling the courts in matters of religious governance, contrary to the well established principle that under the First Amendment "civil courts are not a constitutionally permissible forum for a review of ecclesiastical disputes." Jae-Woo Cha v. Korean Presbyterian Church, 262 Va. 604, 610, 553 S.E.2d 511, 514 (2001); see also Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 710 (1976); Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449, (1969). While what is or is not an "ecclesiastical dispute" is often debatable, issues of religious governance are unquestionably outside the jurisdiction of the civil courts. Reid, 229 Va. at 187, 327 S.E. 2d at 111-12. The record of the present cases confirms that permitting the polity of the church to determine whether a division has occurred could potentially involve the court in disputes involving church governance.

While it is certainly possible that a division within a hierarchical church could occur through an orderly process under the church's polity, history and common sense suggest that such is rarely the case. To the contrary, experience shows that a division within a formerly uniform body almost always arises from a disagreement between the leadership under

26

the polity and a dissenting group.  The construction of division adopted by the circuit court does not, as TEC and the Diocese contend, "vest[] control solely in local majorities" to determine whether a division has occurred.  Indeed, it is clear that a majority vote by one or more congregations to separate from a hierarchical church under Code § 57-9(A) would not alone be sufficient to establish the fact of a division.  To the contrary, we agree with the circuit court that the standard it adopted places a significant burden on the petitioning congregation to establish that the requisite "division" has occurred and that this "division" led to the vote to separate.  Moreover, in resolving the issue of whether a division has occurred under the standard adopted by the circuit court, there is no requirement that the court involve itself in questions of religious governance or doctrine.  Rather, the court simply determines from the facts presented whether the division has occurred, without regard to the nature of the dispute, whether over doctrine or some other cause, which lead to the separation of the congregation and its attachment to a different polity.

The evidence presented by the CANA Congregations clearly establishes that a split or rupture has occurred within the Diocese and, given the evidence of similar events in other dioceses of TEC, the split or rupture has occurred at the

27

national level as well. Likewise, there can be no question that as a result, members and congregations have separated from the Diocese and TEC and have aligned with different polities, formed in response to the dissension within the Diocese and TEC. Accordingly, we hold that the circuit court did not err in finding that a "division" had occurred in the Diocese and TEC within the meaning of Code § 57-9(A).

The circuit court next found that the CANA Congregations were "attached" to the Diocese and TEC. There was not, nor could there be, any serious dispute that, until the discord resulting from the 2003 General Convention, the CANA Congregations were "attached" both to TEC and the Diocese because they were required to conform to the constitution and canons of TEC and the Diocese. Accordingly, we agree that for purposes of Code § 57-9(A), the CANA Congregations established that they were previously "attached" to TEC and the Diocese.

We turn now to consider the circuit court's finding that CANA and the ADV are "branches" of TEC and the Diocese for purposes of applying Code § 57-9(A). For the reasons that follow, we hold that the circuit court's finding was erroneous.

In its second assignment of error, TEC contends that the circuit court's definition of a "branch" as meaning "a division of a family descending from a particular ancestor"

demonstrates that CANA is a branch of the Church of Nigeria, not of TEC.  Likewise the ADV, as a district of CANA, descends from the Church of Nigeria and CANA, not the Diocese or TEC.  TEC contends that the historical connection between it and the Church of Nigeria through the Anglican Communion is not sufficient to establish that constituent parts of each church are "branches" of the other.  TEC further contends that the circuit court erred in giving particular significance to the fact that the majority of the congregations in the ADV and CANA were formerly affiliated with TEC and its dioceses.  We agree.

When it was initially formed, CANA was a mission of the Church of Nigeria designed to minister to expatriate members of that church in North America.  The subsequent expanding of the mission to allow dissident congregations of TEC and the Diocese to affiliate with CANA, and the formation of the ADV, unquestionably occurred in response to the disputes that had occurred within TEC.  However, it is equally clear that the revision of CANA's mission and the formation of the ADV did not occur as a result of the division within TEC and the Diocese.  Indeed, the dissenting congregations maintained that they had "determined to disaffiliate from TEC and the Diocese" in order to join CANA, a pre-existing polity within the Church of Nigeria.  Thus, while CANA is an "alternative polity" to

29

which the congregations could and did attach themselves, we hold that, within the meaning of Code § 57-9(A), CANA is not a "branch" of either TEC or the Diocese to which the congregations could vote to join following the "division" in TEC and the Diocese as contemplated by Code § 57-9(A).

In summary, we conclude that the evidence does not establish that there was a division in the Anglican Communion for purposes of the application of Code § 57-9(A). We further conclude that a proper construction of Code § 57-9(A) requires a petitioning congregation to establish both that there has been a division within the church or religious society to which it is attached and that subsequent to that division the congregation seeks to affiliate with a branch derived from that same church or religious society. While the branch joined may operate as a separate polity from the branch to which the congregation formerly was attached, the statute requires that each branch proceed from the same polity, and not merely a shared tradition of faith. The record in these cases shows that the CANA Congregations satisfied the first of these requirements in that there was a division within TEC and the Diocese, but not the second, as CANA clearly is not a branch of either TEC or the Diocese. Accordingly, we hold that the circuit court erred in ruling that the CANA

30

Congregations' petitions were properly before the court under Code § 57-9(A).[11]

By granting the CANA Congregations' Code § 57-9(A) petitions, the circuit court ruled that this "obviate[d] the need to address the merits of the Declaratory Judgment Actions filed by the Episcopal Church and the Diocese and thus render[s] them legally moot." In light of our holding that the circuit court erred in granting the Code § 57-9(A) petitions, the control and ownership of the property held in trust and used by the CANA Congregations remains unresolved. Accordingly, the declaratory judgment actions filed by TEC and the Diocese, and the counterclaims of the CANA Congregations in response to those suits, must be revived in order to resolve this dispute under principles of real property and contract law.[12] See, e.g., Code § 57-7.1; Trustees of Asbury

_____

[11] Because we have concluded that the CANA Congregations have not satisfied the requirements for petitioning the circuit court for relief under Code § 57-9(A), we need not address TEC's and the Diocese's assignments of error challenging the court's finding that the statute was not violative of the First Amendment and Due Process.

[12] The Diocese has also assigned error to the circuit courts' determination that it lacked jurisdiction to reconsider an order entered in a prior proceeding approving the transfer of property from Christ Redeemer Church to Truro Church. See note 9, supra. While we agree with the circuit court that the Diocese was attempting to bring an improper collateral attack on a final judgment, it is nonetheless evident that as the property is held for the benefit of Truro Church, the ultimate determination of ownership and control of

31

United Methodist Church v. Taylor & Parrish, Inc., 249 Va. 144, 452 S.E.2d 847 (1995); Green v. Lewis, 221 Va. 547, 272 S.E.2d 181 (1980); Norfolk Presbytery v. Bollinger, 214 Va. 500, 201 S.E.2d 752 (1974).

CONCLUSION

For these reasons, we will reverse the judgment of the circuit court and remand with direction to dismiss the CANA Congregations' Code § 57-9(A) petitions.  We will further direct the circuit court to reinstate the declaratory judgment actions filed by TEC and the Diocese and the counterclaims of the CANA Congregations to those actions, and conduct further proceedings thereon consistent with the views expressed in this opinion.

> Record No. 090682 – <u>Reversed and remanded</u>.
> Record No. 090683 – <u>Reversed and remanded</u>.

---

that property will be resolved in the proceedings on the declaratory judgment actions.  Accordingly, we need not address this issue.