COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Malveaux and Frucci
Argued at Richmond, Virginia


CATHOLIC DIOCESE OF RICHMOND

                                                          MEMORANDUM OPINION[*] BY
v.        Record No. 1973-24-2                          JUDGE MARY BENNETT MALVEAUX
                                                               NOVEMBER 5, 2025
OLIVER JOSEPH SMALLS, JR.


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Randall G. Johnson, Jr., Judge

Melissa Y. York (David P. Corrigan; R. Matthew Black; Harman,
Claytor, Corrigan & Wellman, on briefs), for appellant.

Katarina A. Nguyen (Steven A. Krieger; Steven Krieger Law PLLC,
on brief), for appellee.


In this interlocutory appeal, the Catholic Diocese of Richmond ("the Diocese") challenges

the circuit court's denial of its special plea in bar asserting the ecclesiastical abstention doctrine to

shield itself from a defamation suit brought by Oliver Joseph Smalls, Jr.[1] On appeal, we reverse the

rulings of the circuit court on this issue and hold that Smalls's defamation claim is barred by the

protections for religious liberty in the First Amendment of the United States Constitution and

Article I, Section 16 of the Virginia Constitution.

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The trial court denied the Diocese's plea in bar asserting the ecclesiastical abstention doctrine and also its motion to reconsider based on the same grounds. The circuit court certified its rulings on both motions for an interlocutory appeal under Code § 8.01-675.5(A), and we granted the Diocese's subsequent petition for appeal.

BACKGROUND

In May 2022, Smalls filed a complaint against the Diocese, alleging that the Bishop of the Diocese, Barry Knestout, defamed him by asserting that he had been credibly accused of sexually abusing a minor. In the complaint, Smalls alleged that he had lived and worked in Belize as an ordained priest and had been employed by the Diocese of Belize for multiple decades, most recently working in a church in Belize City from 2013 until 2019. Prior to that, for seven months in 1975, he was employed by the Virginia Home for Boys, caring for and mentoring "troubled boys referred by various social service agencies."

In February 2019, the Diocese published to its website a document entitled, "List of all Clergy with Credible and Substantiated Allegations of Sexual Abuse of Minors" (the "List").[2] The introduction to the List stated, "Below are the names of clergy that have served in the Catholic Diocese of Richmond and have a credible and substantiated allegation of sexual abuse involving a minor." The List included Smalls's name.

Smalls's complaint alleged that the Diocese's "unreliable and false allegation that [he] engaged in sexual abuse of minors [was] patently, categorically, and demonstrably false." He also alleged that, prior to the publication of the List, his "reputation as a Catholic priest and person ha[d] been exemplary." As a result of the publication of the List, Smalls was "suspended indefinitely by the Diocese of Belize, S.A., from engaging in his priestly duties." The "abundant residual consequences of [his] suspension" included his inability to celebrate morning mass, visit schools, meet with parishioners, perform blessings, visit the sick, or work with youth groups. In addition, he also suffered pecuniary losses, including the loss of a monthly stipend from the Diocese of Belize, free room and board, and fees he obtained from conducting funerals,

---

[2] The same day the List was published by the Diocese, the Richmond Times-Dispatch published online and print articles that reproduced it.

weddings, baptisms, blessings, and other events.  Smalls alleged that the publication of the List "caused irreparable damage to [his] reputation in his personal and professional community" and also caused him "severe emotional distress, humiliation, shame, embarrassment, and depression."

Specifically related to the defamation elements, Smalls alleged that: (1) the "publication constitutes false statements of fact, as they pertain to [defendant]"; (2) the Diocese "knew or should have known that the allegations against [him] were false, and/or acted with reckless disregard as to their truth or falsity"; and (3) the Diocese "acted negligently and failed to ascertain supporting and reliable facts."  He contended that the publication was defamatory per se because "it impute[d] to [him] unfitness to perform the duties of his employment, and life's work, as a Catholic priest," and it alleged "the commission of a criminal offense involving moral turpitude."  The publication was also defamatory per quod because it "impugn[ed] [his] moral decency, his character, and his professional and personal reputation in his community and worldwide."  Smalls asked for $2 million in compensatory damages and $350,000 in punitive damages.

The Diocese filed a special plea in bar asserting that the complaint should be dismissed under the ecclesiastical abstention doctrine.  As part of its pleadings related to the plea in bar, the Diocese filed an exhibit entitled "Charter for the Protection of Children and Young People" (the "Charter"), subtitled "Essential Norms for Diocesan/ Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons."  The document is a collection of "practical and pastoral steps" put in place "[t]o make effective our goals of a safe environment within the Church for children and young people and of preventing sexual abuse of minors by clergy in the future."  These steps were "approved by the full body of U.S. Catholic bishops," who also committed to implementing them in their own particular dioceses.

Article Five of the Charter discusses the consequences related to sexual abuse of a minor committed by Catholic clergy. As well as providing guidelines regarding punishment for this behavior, this section of the Charter states that "[s]exual abuse of a minor by a cleric is a crime in the universal law of the Church." Article Seven of the Charter concerns the church's policy regarding transparency surrounding issues of sexual abuse of minors by clergy. The article provides that "[d]ioceses . . . are to be open and transparent in communicating with the public about sexual abuse of minors by clergy within the confines of respect for the privacy and the reputation of the individuals involved." It notes that "[t]his is especially so with regard to informing parish and other church communities directly affected by sexual abuse of a minor."

The Charter later includes a definition of "sexual abuse of a minor":

> §1. The more grave delicts against morals which are reserved to the Congregation for the Doctrine of the Faith are:
>
> > 1* the delict against the sixth commandment of the Decalogue[3] committed by a cleric with a minor below the age of eighteen years; in this case, a person who habitually lacks the use of reason is to be considered equivalent to a minor.
> >
> > 2* the acquisition, possession, or distribution by a cleric of pornographic images of minors under the age of fourteen, for purposes of sexual gratification, by whatever means or using whatever technology[.]

Related to this definition, the Charter provides that "[i]f there is any doubt whether a specific act qualifies as an external, objectively grave violation, the writings of recognized moral theologians should be consulted" and that "[u]ltimately, it is the responsibility of the diocesan bishop/eparch, with the advice of a qualified review board, to determine the gravity of the alleged act."

---

[3] The Decalogue is commonly referred to as the Ten Commandments, which are "the precepts divinely revealed to Moses on Mt. Sinai." *Commandments*, *The Ten*, *The Oxford Dictionary of the Christian Church* (2nd ed. 1974).

At the hearing on the plea in bar, Bishop Knestout testified that he was responsible for overseeing the "life and ministry and work" of the Diocese and its 150 active clergy. As bishop, he had "autonomous jurisdiction" and "governance" over the Diocese, including all "executive, legislative, and judicial functions in terms of the ministry and oversight." Bishop Knestout explained that the Catholic Church has specific policies with respect to sexual abuse of minors by clergy, including the Charter, which "gives the scope, principles, and expectations for how dioceses in a consistent way throughout the country would promulgate policies and ensure the protection of the children and minors." He testified that "part of the [C]harter is that we are to communicate to the public as effectively and as transparently with accountability as possible regarding accusations of abuse."

Due to the Charter's policy regarding transparency, and in response to national media reporting cases of clergy sexual abuse, Bishop Knestout wanted to "ensure that there was a comprehensive review of files and backgrounds of all the clergy that ha[d] served in the [D]iocese for the past 50 years." This review was conducted to enable Bishop Knestout to determine the number of clergy who had been accused "either credibly or substantiated in any way." He hired independent investigators who reviewed a thousand files and "flagged" some for further review. Out of those, Bishop Knestout personally reviewed 60 files.

During this process, Bishop Knestout's "religious thinking" involved "us[ing] as a model" the church's "sacrament of reconciliation." He explained that publishing the List "was both transparent, as well as accountable, that we would be accountable for the damage that was done and we would try to find ways to remedy that spiritually, as well as temporally."

When the Diocese published the List, Bishop Knestout neither employed Smalls nor had the ability to fire him; his ministries did not include the Diocese of Belize. Bishop Knestout included Smalls on the List, however, because the report of Smalls's sexual abuse "came through

- 5 -

while [Smalls] was a seminarian of the [D]iocese of Richmond." In addition, Bishop Knestout testified that "the life and ministry of bishops" in the Catholic Church include "the unity and the discipline of the church worldwide" and "not only for his own diocese and jurisdiction."

The circuit court denied the Diocese's plea in bar. The court found that the ecclesiastical abstention doctrine might have applied had the Diocese made only "an internal publication," instead of broadcasting the statement "to the public" on its website. In addition, the court found significant that there was "no qualification" to the allegation that Smalls was the subject of a "credible and substantial claim of sexual abuse," such as clarifying that the statement was "from a religious standpoint or as defined by the Catholic Church." Because that statement was "broadcast to the public, a reasonable person would believe that the public would apply secular terms . . . not . . . the Catholic meanings." Therefore, the court reasoned, "when you broadcast that to the public . . . the issue is not . . . ecclesiastical matters, it is squarely secular matters."

The Diocese subsequently moved the circuit court to reconsider its plea of ecclesiastical abstention after this Court released its decision in *Episcopal Diocese of Southern Virginia v. Marshall*, 81 Va. App. 255 (2024). The court denied the motion to reconsider, distinguishing *Marshall* on the basis that the publication in that case "was meant to be inside the church," whereas here, "[t]he goal . . . was to be open and transparent with the public." And by broadcasting the List to the public without stating it was "in the context of the Catholic Church or of the Catholic canons or of the Catholic policies," the Diocese "waived" the "protections of the First Amendment."

The Diocese moved the circuit court to certify its rulings on the plea in bar and motion for reconsideration for an interlocutory appeal under Code § 8.01-675.5(A). The circuit court granted the motion and stayed further litigation. This Court subsequently granted the petition for interlocutory appeal.

- 6 -

ANALYSIS

On appeal, the Diocese challenges the circuit court's denial of its plea in bar, arguing that the ecclesiastical abstention doctrine applies to Smalls's complaint for defamation, and thus the court should have dismissed the case for lack of subject matter jurisdiction. The Diocese also asserts that the court erred in denying its motion for reconsideration on those same grounds.

"A plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery." *Cornell v. Benedict*, 301 Va. 342, 349 (2022) (quoting *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019)). "The movant bears the burden of proof on such a plea, and if evidence is presented ore tenus, the circuit court's factual findings 'are accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support.'" *Id.* (quoting *Massenburg*, 298 Va. at 216). "When the plea in bar depends on pure legal questions, including questions of statutory construction, we review the circuit court's holding de novo." *Id.* Additionally, "whether to grant a motion to reconsider is within the circuit court's sound discretion." *Rosson v. Erie Ins. Exch.*, 79 Va. App. 266, 284 (2023).

The First Amendment to the Constitution of the United States provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Similarly, Article 1, Section 16 of the Constitution of Virginia provides that "religion or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and, therefore, all men are equally entitled to the free exercise of religion, according to the dictates of conscience."[4]

---

[4] In *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504 (2023), our Supreme Court, in addressing a free-exercise clause challenge in the context of school employment, noted, "[b]ecause of the marked textual differences between the religion clauses of the First Amendment of the United States Constitution and the free-exercise provisions of the Constitution of Virginia, interpretations of the former inform but do not necessarily govern the construction of the latter."

"Subject matter jurisdiction is a threshold question." *Parrish v. Fannie Mae*, 292 Va. 44, 49 (2016). "As a general rule, courts lack subject matter jurisdiction to resolve issues of church governance and disputes of religious doctrine. This prohibition arises from the religion clauses of the Constitution of the United States and the Constitution of Virginia." *Pure Presbyterian Church of Wash. v. Grace of God Presbyterian Church*, 296 Va. 42, 51 (2018) (quoting *Bowie v. Murphy*, 271 Va. 126, 133 (2006)). In such cases, "there is a danger that the power of the state may be called upon to aid a faction espousing a particular doctrinal belief, or to 'become entangled in essentially religious controversies.'" *Reid v. Gholson*, 229 Va. 179, 187 (1985) (quoting *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976)).

But this prohibition, which we refer to as the ecclesiastical abstention doctrine, does not bar our courts from resolving any matter involving a church. "[W]here church property and civil rights disputes can be decided without reference to questions of faith and doctrine, there is no constitutional prohibition against their resolution by the civil courts." *Id.* Accordingly, "a secular court may adjudicate controversies arising in religious settings if it can do so based on 'neutral principles of law' that are 'completely secular in operation.'" *Marshall*, 81 Va. App. at 271 (quoting *Jones v. Wolf*, 443 U.S. 595, 602-03 (1979)). "In essence, for this Court to apply 'neutral principles,' the parties must plead a secular dispute at heart before it—one that does not require the civil court to decide an ecclesiastical question, and one devoid of '*underlying controversies* over religious doctrine.'" *Atl. Korean Am. Presbytery v. Shalom Presbyterian Church of Wash., Inc.*, 84 Va. App. 1, 44 (2025) (quoting *Pure Presbyterian*, 296 Va. at 53-54);

---

*Id.* at 530. We need not parse the significance of the textual differences between these provisions here because established legal principles are sufficient to answer the question raised in the Diocese's assignments of error. *See Marshall*, 81 Va. App. at 269 ("*Vlaming* teaches that the Virginia Constitution provides more robust protections for religious liberty than the First Amendment. But we need not break new ground to measure those differences here, since existing constitutional doctrine suffices to resolve this dispute." (citation omitted)).

*see also Reid*, 229 Va. at 187 (noting that in considering whether "to resolve disputes concerning the civil and property rights of religious bodies and church members," courts must ask whether resolving the dispute "will project the fact-finder into . . . a 'religious thicket'" (quoting *Serbian E. Orthodox Diocese*, 426 U.S. at 719)).

Our Supreme Court has previously considered the neutral-principles approach when evaluating defamation claims in religious settings. In *Jae-Woo Cha v. Korean Presbyterian Church*, 262 Va. 604 (2001), the plaintiff, a pastor who was fired by his church, sued the church for defamation, alleging that church leaders had made false statements about his financial integrity. *Id.* at 610. On appeal, our Supreme Court affirmed the circuit court's ruling that it lacked subject matter jurisdiction over the pastor's defamation claim. *Id.* at 614. The Court, noting that the allegations at issue centered on the plaintiff's fitness as a pastor, held that in addressing the matter, a civil "court would be compelled to consider the church's doctrine and beliefs because such matters would undoubtedly affect the plaintiff's fitness to perform pastoral duties." *Id.* at 615. Accordingly, such an inquiry by a civil court is prohibited under the religion clauses of the Constitution of the United States and the Constitution of Virginia. *Id.*

Reaching the opposite conclusion in *Bowie v. Murphy*, 271 Va. 126 (2006), our Supreme Court held that the circuit court could exercise jurisdiction over a plaintiff's defamation claim against his pastor arising from the pastor's claims that the plaintiff perpetrated an assault during a church meeting. *Id.* at 129-31, 134. The Court held that the circuit court could evaluate the alleged defamatory statements "for their veracity and the impact they had on [the plaintiff's] reputation the same as if the statements were made in any other, non-religious context." *Id.* at 135. Thus, because the circuit court could "decide the case by reference to neutral principles of law, without reference to issues of faith and doctrine," it had subject matter jurisdiction to hear the case. *Id.* (quoting *Reid*, 229 Va. at 188).

Our Court subsequently applied the holdings of *Jae-Woo Cha* and *Bowie* in another church-related defamation case, *Episcopal Diocese of Southern Virginia v. Marshall*, 81 Va. App. 255. In *Marshall*, the plaintiff, the rector of a church, sued the church, the church's governing body, and a church leader for defamation in relation to statements made by the church leader during a church service. *Id.* at 259-63. The statements concerned a sexual assault investigation involving the plaintiff that resulted in his firing by the church. *Id.* at 262-63. On appeal, our Court held that the ecclesiastical abstention doctrine prohibited the circuit court from adjudicating the defamation claim. *Id.* at 276-77. Noting that our Supreme Court had previously addressed the issue of defamation in church-dispute contexts, our Court listed "[f]ive considerations [that] show why *Jae-Woo Cha* controls the outcome here and why this case is distinguishable from *Bowie*": (1) the resolution of the matter would require the circuit court to wade into the area of church governance; (2) the circuit court's evaluation of the truth of the church leader's statements about the plaintiff would be dependent on the ecclesiastical definition of sexual misconduct; (3) the dispute derived from "a church-disciplinary investigation that culminated in the minister's firing, a decision at the core of a church's self-governance"; (4) the plaintiff's claim that the church leader's defamation caused his firing "would raise intractable causation questions that would further ensnare the trial court in religious matters," specifically in relation to his damages; and (5) the plaintiff had "pledged to follow rules" subjecting him to the internal church discipline rather than relief through a secular court. *Id.* at 273-76. Based on these considerations, our Court concluded that the plaintiff's "defamation claim [was] so intertwined with the [church leader's] deposing him as a priest that the defamation claim cannot be litigated without entangling the court in a religious dispute." *Id.* at 276-77.

This line of Virginia appellate cases—*Jae-Woo Cha*, *Bowie*, and *Marshall*—are utilized by both parties in arguing their respective positions. While helpful, all can be distinguished

factually from the circumstances before us. So we focus not on the specific facts laid out in these cases, but rather, the guiding question surrounding the ecclesiastical abstention doctrine found in all three—can a civil court adjudicate the matter before us based on neutral principles of law? *See Marshall*, 81 Va. App. at 271 ("[A] secular court may adjudicate controversies arising in religious settings if it can do so based on 'neutral principles of law' that are 'completely secular in operation.'" (quoting *Jones*, 443 U.S. at 602-03)).

To answer this question, we turn to the elements of Smalls's claim. To state a claim for defamation, a plaintiff must allege "(1) publication of (2) an actionable statement with (3) the requisite intent" by the defendant. *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015) (quoting *Tharpe v. Saunders*, 285 Va. 476, 480 (2013)). Finding it dispositive to our question, we examine only the second element and consider whether a civil court could determine if the Diocese had published an actionable statement without "entangling the court in a religious dispute." *Marshall*, 81 Va. App. at 277.

To be "actionable," the alleged defamation must be a "false factual statement that concerns and harms the plaintiff or the plaintiff's reputation." *Lewis v. Kei*, 281 Va. 715, 725 (2011). "True statements and opinions are not actionable." *Nestler v. Scarabelli*, 77 Va. App. 440, 454 (2023). "Whether a plaintiff has sufficiently proven the falsity of the alleged defamatory statements is a jury question." *Jordan v. Kollman*, 269 Va. 569, 576 (2005). Thus, to prevail on his claim, Smalls must prove that Bishop Knestout's statement—that there was "a credible and substantiated allegation of sexual abuse involving a minor" against Smalls—was false.

To determine whether this statement was false, the circuit court would have had to examine the methodology used by Bishop Knestout in placing Smalls's name on the List. As noted above, the Charter, a policy of the Catholic Church related to the issue, includes a specific

definition of the offense. "Sexual abuse of minor" is defined as a violation of "the sixth commandment of the Decalogue committed by a cleric with a minor below the age of eighteen years" or as "the acquisition, possession, or distribution by a cleric of pornographic images of minors under the age of fourteen, for purposes of sexual gratification, by whatever means or using whatever technology." And "[i]f there is any doubt whether a specific act qualifies as an external, objectively grave violation, the writings of recognized moral theologians should be consulted, and the opinions of recognized experts should be appropriately obtained."

It is clear that the definition used to determine that there was a credible and substantiated allegation against Smalls of sexual abuse involving a minor includes references to religious precepts.[5] The definition discusses sexual abuse in terms of a violation of the Sixth Commandment. It also provides that clergy who possessed, acquired, or distributed "pornographic images of minors under the age of fourteen" committed sexual abuse, but does not define "pornographic images." But if there is doubt as to whether such an offense has occurred, bishops are directed to reference writings of moral theologians. Smalls's defamation claim thus rests on the falsity of a statement that is based on the application of a specific religious definition

---

[5] In response to the Diocese's motion to reconsider, Smalls filed a memorandum in opposition, arguing that, unlike *Marshall*, here the ecclesiastical and secular definitions of "sexual abuse of minors" are very similar. He attached an exhibit to the memorandum, entitled "Glossary of Terms – Congregation for the Doctrine of the Faith," printed off from a Vatican website, which defines "sexual abuse of a minor" as "contact or interaction between a minor and an adult when the minor is being used for sexual stimulation of the adult. This occurs when an adult engages a minor in any sexual activity." Utilizing this definition, Smalls argues that his claim can be decided by neutral principles of law because "the term 'sexual abuse of a minor' as used in the List is functionally identical to the criminal definitions used in the Virginia Code." But the exhibit provided by Smalls explicitly states that "[t]hese terms are provided to assist the lay person in understanding concepts, mostly canonical in nature, often used regarding the handling of cases involving sexual abuse" and "provide an aid, but cannot substitute, careful study of canon law." The definition provided by Smalls is one that was provided for lay members, not clergy. The definition provided by the Diocese, found in the Charter, is the definition used by bishops in the Catholic Church in adjudicating whether a clergy member has committed sexual abuse of a minor.

of sexual abuse. "[C]ivil courts cannot adjudicate defamation claims when the truth of the statements in question turns on ecclesiastical law." *Marshall*, 81 Va. App. at 275.[6]  Here, as in *Marshall*, "evaluating the truth of the bishop's statements about [Smalls] would turn on the ecclesiastical definition of sexual misconduct." *Id.* at 274.  Because resolution of Smalls's defamation suit would have required the circuit court to evaluate the meaning of sexual abuse of a minor, as defined by the Catholic Church, and whether Bishop Knestout was accurate in his conclusions, we hold that the ecclesiastical abstention doctrine prohibits a civil court from adjudicating this matter.[7]  Accordingly, we hold that the circuit court erred in denying the Diocese's plea in bar.

---

[6] While a dispute involving a church can be adjudicated by a secular court based on a neutral review of the governing documents of a church, "[t]he governing documents . . . must be evaluated 'in purely secular terms,' and the court cannot 'rely on religious precepts.'" *Marshall*, 81 Va. App. at 271 (quoting *Jones*, 443 U.S. at 604).  Here, the governing document—the Charter—provided a definition of abuse based on religious precepts that could not be evaluated in secular terms.

[7] The circuit court found that the ecclesiastical abstention doctrine did not apply in this case because the Diocese published the statement to the public on its website, rather than its internal church audience, and because it did not notify the public that the allegation concerned sexual abuse as defined by the Catholic Church and not sexual abuse as viewed from a secular viewpoint.  Smalls asserts that this Court should adopt this reasoning; finding it unpersuasive, we decline the invitation.

Regarding the publication to the public rather than only a church audience, we again note that the dispositive question in determining whether the ecclesiastical abstention doctrine applies is whether a secular court can apply neutral principles of law in resolving the dispute, and not the particular audience for the publication.  "Whether a party's claims against a church are barred by ecclesiastical abstention . . . is based not on whether a publication goes beyond church walls but rather whether the substance and nature of the plaintiff's claims implicate ecclesiastical matters, including a church's internal affairs, governance, or administration." *In re Diocese of Lubbock*, 624 S.W.3d 506, 516 (Tex. 2021).

Concerning the argument that the publication did not notify the public that the allegation involved sexual abuse as defined by the Catholic Church, we acknowledge that "[w]e give 'allegedly defamatory words . . . their plain and natural meaning[,] . . . to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used.'" *Nestler*, 77 Va. App. at 454 (second, third, and fourth alterations in original) (quoting *Carwile v. Richmond Newspapers*, 196 Va. 1, 7 (1954)).  But even giving the allegedly defamatory words, that there was "a credible and substantiated allegation of sexual abuse involving a minor" against Smalls, their plain and natural meaning and

CONCLUSION

Because Smalls's claim for defamation cannot be resolved on neutral secular principles, the circuit court was without subject matter jurisdiction to hear the case. Accordingly, because we hold that the circuit court erred in denying the plea in bar, we reverse the court's interlocutory order and enter final judgment here, dismissing the case.

*Reversed and final judgment.*

---

not ascribing a religious meaning to them, a civil court would still have to consider whether this statement was true, because true statements are not actionable. *Id.* Evaluating the truth of this statement would require an examination of the religious precepts found in the Catholic Church's definition of sexual abuse of a minor, and thus a secular court could not consider this element of defamation without delving into religious determinations prohibited under the ecclesiastical abstention doctrine.