## Richmond

### JAMES N. FLEMING

v.

### W. BEDFORD MOORE, III

March 6, 1981.

Record No. 781061.

Present: Carrico, C.J., Harrison, Cochran, Poff, Compton, and Thompson, JJ.*

---

* Mr. Chief Justice I'Anson presided at the oral argument of this case but retired January 31, 1981.

Gerald G. Poindexter; Charles E. Carter [N.Y.] Nathan Jones [N.Y.]; Poindexter & Poindexter, on briefs), for appellant.

Thomas E. Albro (Tremblay & Smith, on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

W. Bedford Moore, III, initiated this libel action against James N. Fleming in the court below. Final judgment was entered by the trial court on the jury verdict awarding Moore $10,000 in compensatory damages and $100,000 in punitive damages.[1]

---

[1] During oral argument, a motion to dismiss for failure to remedy defects in the appeal bond was renewed. On February 21, 1979, when the appeal was awarded, bond was set by this Court at $120,000. On March 6, 1979, the Clerk of the Circuit Court certified that Fleming had appeared before her and given bond in the amount of $120,000 with approved surety. We therefore overrule the motion to dismiss. See Code § 8.01-676; Rule 5:31.

Moore was a white, tenured, assistant professor in the Humanities Division of the School of Engineering at the University of Virginia during the 1975-76 academic year. His residence known as "Shack Mountain", located in Albemarle County, has architectural significance because of its Jeffersonian styling. The Moore land adjoined a tract known as "Evergreen", owned by Fleming and others and situated near the Rivanna Reservoir.

Fleming, a black real estate broker and developer, sought approval in the fall of 1974, first from the Planning Commission and then from the Board of Supervisors of Albemarle County, to have "Evergreen" rezoned from Agriculture to Residential Planned Unit Development. Upon rezoning, Fleming proposed to construct a planned unit development of high-density residential units for a predominantly black, lower-middle-income group of occupants.

The Planning Commission and Board of Supervisors held several meetings to consider Fleming's application and Moore spoke briefly during two of the meetings in opposition to the proposed development. Moore's position was that the project, if constructed, would create a pollution hazard to the Rivanna Reservoir, which supplies water to the City of Charlottesville, and that it would also detract from the value of his own property. Moore never gave interviews to the press concerning the planned development and never spoke about in public except at the two meetings. During the course of public debate over the proposed development, county planning officials advanced the idea that if Fleming's application for rezoning were to be approved, a tree buffer should be required along the boundary line between the "Evergreen" and "Shack Mountain" properties. Moore felt that the buffer would be a good idea since it would screen his property from the "Evergreen" development. Fleming's plan was reviewed by the appropriate county agencies, the public was afforded an opportunity to comment on it, and his application for rezoning was subsequently denied by the Board of Supervisors in December ,1975.

In January, 1976, Fleming published in two newspapers a paid advertisement captioned "RACISM" in which Moore was identified by name. The advertisement appeared in the *Charlottesville-Albemarle Tribune*, a newspaper of general circulation in the community, on January 8, 1976, and in *The Cavalier Daily,* a university student newspaper, in its January 15 and 16, 1976, editions.[2] Claiming that the

---

[2] The advertisement appeared in print as follows:
(Paid Advertisement)
RACISM
I have endeavored to realize the opportunity to provide housing and pleasant

article injured his reputation in the university community, Moore brought this action for libel.

█ The first issue on appeal is whether the trial court erred in ruling, as a matter of law, that the article was defamatory *per se* and in submitting the issue of liability to the jury upon such a theory.[3] At

surroundings for working people—the sort of people who made this great country that it is.

I do not expect any Farmington members to buy my houses. The tenured position-holders who live off the public dole at the expense of the working people are already well-housed, and could not be expected to live in a racially-integrated neighborhood, anyhow.

There is a great deal of irony in the fact that here in Mr. Jefferson's country 200 years after his vision of situating his beloved Monticello upon the hilltop overlooking the developing community we have a replica of Monticello upon the hill overlooking my property which is occupied by a man who wants to deprive working people of the same opportunities that Mr. Jefferson sought for them. Mr. Jefferson even located his slaves' quarters down the hill from his house, but Bedford Moore, the occupant of little Monticello does not want any black people within his sight.

There is a great conflict waging between the haves and the have-nots. Obviously we have created too much financial security for the tenured segment of the economic community whose greed is repeatedly shown by their expression of "I've got mine—too bad about you".

I am a lover of liberty and freedom of opportunity. I cannot stand by and see the have-nots oppressed by the no-growth people who are living off of our work. I know that this Country did not achieve the highest living standard in the world by no-growth or by oppression of the working man, and yet today the opportunity to improve one's living standard is being violently opposed by the same people who oppose my proposed neighborhood.

Pollution of the reservoir is being used as the current excuse to foster no-growth. The solution, of course, is to remove the guaranteed incomes of these greedy people and put them in the position of seeing the world through the eyes of one seeking the opportunity to improve his or her living standard. Only then would they admit that the pollution excuse is a sham.

I will develop Evergreen, and a lot of people will benefit from it.

Signed: JAMES N. FLEMING

[3] It is unclear from the record whether the jury was told that the article, if defamatory at all, was defamatory *per se*. The Appendix includes Instruction No. 8, which so provided, marked "given" by the trial court. Although the transcript records the reading to the jury by the trial court of all other Instructions marked "given", it fails to show that Instruction No. 8 was so read.

Assuming, however, that Instruction No. 8 was not given, we conclude that the trial court submitted the case to the jury upon a theory of *per se* defamation. Other instructions informed the jury that Moore was presumed to have suffered general damages, and that the absence of actual injury was to be considered only in diminution of damages. The presumption of damages is the critical distinction between defamation *per se* and other actions for defamation. *See Shupe* v. *Rose's Stores*, 213 Va. 374, 376, 192 S.E.2d 766, 767 (1972); *Slaughter* v. *Valleydale Packers*, 198

trial, counsel for Fleming conceded that the trial court, rather than the jury, should determine whether the article was libelous *per se,* but he objected to the determination made by the court.

Unlike most states, Virginia makes no distinction between actions for libel and those for slander. *Shupe* v. *Rose's Stores,* 213 Va. 374, 375-76, 192 S.E.2d 766, 767 (1972); *see* Note, *Defamation in Virginia—A Merger of Libel and Slander,* 47 Va. L. Rev. 1116 (1961); W. Prosser, Torts § 112, at 763 n. 33 (4th ed. 1971). We have held that actions for libel are treated as actions for slander, and that the common-law rules of slander are applicable, so that alleged defamatory language is actionable according to the following principles:

> At common-law defamatory words which are actionable *per se* are:
>
> (1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished. (2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society. (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment. (4) Those which prejudice such person in his or her profession or trade. All other defamatory words which, though not in themselves actionable, occasion a person special damages are actionable.

*Shupe,* 213 Va. at 376, 192 S.E.2d at 767, quoting *Carwile* v. *Richmond Newspapers,* 196 Va. 1, 7, 82 S.E.2d 588, 591 (1954).

Racism, of course, is neither a contagious disease nor a criminal offense for which a person may be indicted and punished. Thus, a finding of *per se* defamation in the present case could only be based upon the effect of the allegation upon the plaintiff's work. The trial court ruled, as a matter of law, that the allegation of racism prejudiced Moore in his profession.

To be actionable without proof of "special damages", we have held that the words must contain an imputation that is "necessarily hurtful" in its effect upon plaintiff's business and must affect him in

Va. 339, 346-48, 94 S.E.2d 260, 266 (1956). Since the jury instructions allowed the jury to presume damages, the case was presented to the jury on the theory of *per se* defamation even if Instruction No 8 was not given.

his particular trade or occupation. *James* v. *Haymes,* 160 Va. 253, 261-62, 168 S.E. 333, 336 (1933). *Accord,* W. Prosser, Torts § 112, at 758 (4th ed. 1971) ("defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself"). There must be a nexus between the content of the defamatory statement and the skills or character required to carry out the particular occupation of the plaintiff. Restatement (Second) of Torts § 573, Comment e (1976). For example, because an attorney is required to adhere to the disciplinary rules, charging an attorney with unethical conduct is defamatory *per se. Carwile, supra,* 196 Va. at 8, 82 S.E.2d at 592. The words themselves must necessarily be damaging to the attorney in his profession.

Not every defamatory statement, however, is "necessarily hurtful" to a plaintiff's business and touches the plaintiff in his special trade or occupation. The allegation that a person has refused to pay a money debt is not *per se* defamatory if that person is not engaged in a vocation in which credit is necessary for the proper and effectual conduct of his business. *M. Rosenberg & Sons* v. *Craft,* 182 Va. 512, 519, 29 S.E.2d 375, 378 (1944). *Accord, Weaver* v. *Finance Company,* 200 Va. 572, 106 S.E.2d 620 (1959). Likewise, written notice that credit is being denied to a bookkeeper-secretary does not touch the plaintiff in her special trade or vocation. *See Shupe, supra.* That a defamatory statement may have had an adverse impact upon a plaintiff's work does not make that statement *per se* defamatory where the defamation is not "necessarily hurtful" to the plaintiff's business and does not touch the plaintiff in his special trade or occupation.[4]

Because libel actions in Virginia are governed by common-law rules applicable to slander actions, libel cases from other jurisdictions are not helpful.[5] There are analogous cases, however, holding that slanderous imputations of Communism do not touch the individual in his chosen profession. *See, e.g., Korry* v. *International Telephone & Telegraph Corp.,* 444 F. Supp. 193, 196 (S.D.N.Y. 1978) (allegation

---

[4] "Thus, a statement that a physician consorts with harlots is not actionable per se, although a charge that he makes improper advances to his patients is actionable." The former statement does not necessarily affect his reputation as a physician but the latter directly affects it. Restatement (Second) of Torts § 573, Comment e (1976).

[5] Although Annot., 33 A.L.R.2d 1196, § 15 (1954 & Later Case Service) details many cases concerning allegations of racial intolerance, most of the cases concern libelous, not slanderous, statements. In most jurisdictions, libelous statements are actionable without special damages even though they do not touch the plaintiff in his particular trade or vocation. As we have already noted, Virginia does not distinguish between slander and libel actions.

that journalist, a former ambassador, was a Communist held not to be slanderous *per se*); *Gurtler* v. *Union Parts Mfg. Co.,* 1 N.Y.2d 5, 150 N.Y.S.2d 4, 132 N.E.2d 889 (1956) (allegation that an engineer was a Communist held not to be slanderous *per se*).

■ In the present case, Fleming charged Moore with not wanting blacks to reside within sight of his home, but the allegation of racism was not made in the context of Moore's employment as a teacher.[6] We conclude that, while the allegation *might have* adversely affected Moore's work, the statements did not *necessarily* affect him in his particular profession and consequently were not defamatory *per se.* We hold, therefore, that the trial court erred in ruling that Fleming's advertisement was defamatory *per se* in that it necessarily was hurtful in its effect upon Moore's employment and adversely affected Moore in his capacity as a teacher. The consequence of this erroneous ruling, requiring reversal and remand for a new trial, was that the jury was allowed to presume general damages and also to award punitive damages based on the presumed damages.

Since this case must be remanded for a new trial, we will resolve other issues that otherwise may arise again upon retrial.

■ Fleming contends that Moore was a public figure and thus could not recover damages for defamation in the absence of a showing that the statement was made with "actual malice", that is, with "knowledge that it was false or with reckless disregard of whether it was false or not", as defined in *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 280 (1964).

The Supreme Court in *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 345 (1974), provided the following description of a public figure:

> For the most part those who attain this status [of public figure] have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

■ Moore, a teacher at the University of Virginia, did not occupy a position of "such persuasive power and influence" that he could be

---

[6] The advertisement did not allege, for example, that Moore discriminated against the black students in his classes.

deemed a public figure "for all purposes". Thus, we need only determine whether because of his activity relative to the "Evergreen" proposal he was a public figure for that limited purpose.

We do not believe that Moore's role in the public hearings concerning "Evergreen" merits his classification as a public figure. *Gertz* cautioned that a court must focus upon the "nature and extent of an individual's participation in the particular controversy giving rise to the defamation". 418 U.S. at 352. The mere fact that Moore spoke twice in public hearings concerning the "Evergreen" proposal is not determinative since his use of the public forum substantially resulted from his desire to protect his private interests. In *Time, Inc.* v. *Firestone*, 424 U.S. 448 (1976), the Court held that resort to the judicial process in order to vindicate private rights did not make the plaintiff a public figure. This reasoning appears equally applicable here, where Moore resorted to an administrative body in order to protect the value of his own residence. Moreover, like the plaintiffs in *Wolston* v. *Reader's Digest, Inc.*, 443 U.S. 157, 167 (1979), and *Gertz,* Moore never discussed the "Evergreen" proposal with the media. He did not attempt to organize or lead opposition to "Evergreen". Since Moore's involvement at the public hearings was in his capacity as an adjoining private landowner whose property might be affected by the proposed development, we conclude that he was not a public figure. Therefore, he was not required to show, as a prerequisite to recovery of compensatory damages, that Fleming acted with malice that met the *New York Times* standard.

██ Fleming further contends, however, that even if Moore was not a public figure, the trial court erred in allowing the jury to award punitive damages on the basis of common-law malice.[7] In *Gertz*, the Court condemned the awarding of either presumed or punitive damages, "at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth".[8] 418 U.S. at 349. The award of damages without proof of "actual injury"[9] was con-

---

[7] The court instructed the jury in Instruction No. 9 that punitive damages could be awarded if the jury believed from a preponderance of the evidence that Fleming acted with "actual malice", that is, that he "was motivated by revenge, personal spite, ill will or a desire to injure the Plaintiff".

[8] Since we have ruled that Moore may not recover presumed damages because the article was not libelous *per se,* we do not reach Fleming's contention that *Gertz* would prohibit the awarding of presumed damages without a showing of knowing falsity or reckless disregard for the truth.

[9] The opinion noted that damages for "actual injury" are not limited to out-of-pocket loss, and that trial courts are permitted to compensate for impairment of reputation and standing in the community, personal humiliation, and mental anguish

demned as "invit[ing] juries to punish unpopular opinion rather than to compensate individuals for injury sustained by the publication of a false fact". *Id.* On the basis of *Gertz,* we vacated an award of punitive damages entered against a publisher where the award was based upon a finding of common-law malice, and held that it was necessary to show knowledge of falsity or reckless disregard for the truth by "clear and convincing evidence" before punitive damages could be awarded. *Newspaper Publishing Corp.* v. *Burke,* 216 Va. 800, 805, 224 S.E.2d 132, 136 (1976).

*Gertz,* however, did not explicitly extend its rule to non-media defandants. Indeed, the Supreme Court has recently noted that it has not resolved whether the First Amendment requires application of the *New York Times* rule in cases involving non-media defendants. *Hutchinson* v. *Proxmire,* 443 U.S. 111, 133-34 n. 16 (1979).[10] Since Fleming is not a media defendant and Moore is not a public figure, *Gertz* does not control the present case. Nevertheless, we share the concern expressed in *Gertz* at the assessment by juries of punitive damages "in wholly unpredictable amounts bearing no necessary relation to the actual harm caused". 418 U.S. at 350. Therefore, we hold that any instruction on punitive damages must be structured upon the same standard of proof of "actual malice", as defined in *New York Times,* applied in *Gertz,* and followed in *Burke,* that is required in defamation actions against media defendants, *i.e.,* clear and convincing proof of knowledge of falsity or reckless disregard for the truth.

In conformity with the general rule in tort actions, no punitive damages may be awarded for slander or libel unless compensatory

---

and suffering. Awards must be supported by competent evidence, although it is not necessary that the evidence assign a dollar value to the injury. 418 U.S. at 350.

[10] Lower courts are divided on whether the First Amendment protections provided media defendants in *New York Times* and *Gertz* are applicable to non-media defendants. Several courts have refused to extend *Gertz. Rowe* v. *Metz,* 195 Colo. 424, 579 P.2d 83 (1978), *rev'g* 39 Colo. App. 20, 564 P.2d 425 (1977); *Gengler* v. *Phelps,* 92 N.M. 465, 589 P.2d 1056 (1978); *Harley-Davidson Motorsports, Inc.* v. *Markley,* 279 Or. 361, 568 P.2d 1359 (1977); *Calero* v. *Del Chemical Corp.,* 68 Wis.2d 487, 228 N.W.2d 737 (1975). Other courts have refused to distinguish between the protections afforded media and non-media defendants. *Bryan* v. *Brown,* 339 So.2d 577, 583-84 (Ala. 1976), *cert. denied,* 431 U.S. 954 (1977); *Millsaps* v. *Bankers Life Company,* 35 Ill. App. 3d 735, 342 N.E.2d 329 (1976); *Jacron Sales Co.* v. *Sindorf,* 276 Md. 580, 350 A.2d 688 (1976), *aff'g* 27 Md. App. 53, 341 A.2d 856 (1975); *Ryder Truck Rentals* v. *Latham,* 593 S.W.2d 334 (Tex. Civ. App. 1979). *See* J. Eaton, *The American Law of Defamation Through Gertz* v. *Robert Welch, Inc., and Beyond: An Analytical Primer,* 61 Va. L. Rev. 1349, 1417 (1975), predicting extension by the Supreme Court of *Gertz* to defamation suits against non-media defendants where the defamatory falsehood was published by the press.

damages are awarded. As an exception to the rule it is generally held that in a slander or libel action, where the defamation is actionable *per se,* punitive damages alone may be awarded. We approved the rule and the exception in *Burke, supra,* 216 Va. at 805, 224 S.E.2d at 136. As the advertisement in the present case was not actionable *per se,* the exception is not applicable.

Moore did not allege or prove that he suffered any monetary loss. He did allege, however, that he had been insulted, mortified, held up to ridicule, and humiliated by the statement. We conclude that in libel actions not based upon *per se* defamation, where knowing falsity or reckless disregard for the truth is not shown, the compensatory damages should be limited to the actual damages proved to have been sustained, but such damages should not necessarily be restricted to out-of-pocket loss. *See* fn. 10 *supra.* Therefore, we hold that Moore is entitled to recover compensatory damages upon proof of actual injury, including such elements as damage to his reputation and standing in the community, embarrassment, humiliation, and mental suffering. "Special damages", which under the common-law rule must be shown as a prerequisite to recovery where the defamatory words are not actionable *per se,* are not to be limited to pecuniary loss. To the extent that language in *Shupe* may be construed to indicate that emotional upset and embarrassment cannot constitute "special damages", it is hereby modified.

For the reasons assigned, the judgment of the trial court will be reversed and the case remanded for a new trial consistent with the views herein expressed.

*Reversed and remanded.*

HARRISON, J., dissenting.

I find the jury's awards totalling $110,000 in this case to be shocking. It is inconceivable that a respected professor, as is Mr. Moore, could have been damaged in the University community or elsewhere by the "advertisement" which appeared at the behest of Mr. Fleming.

I attach little significance to the word "racism" which heads the advertisement. The words "racism" and "racist" are bandied about in our society with complete abandon. People of all races currently utilize these terms to voice their innumerable real and imagined grievances. Indeed, it would not be difficult to find a newspaper which contains a complaint by one party against another for some action allegedly grounded in "racism", or "reverse racism."

When we examine the advertisement inserted in the papers and strip therefrom Fleming's self-laudatory and hortatory language, we find that he takes a dim view of Farmington members and tenured professors and feels that without their financial security they would be more sympathetic to the "have nots." The advertisement then makes a comparison between Thomas Jefferson and Professor Moore in which the latter emerges "second best." Fleming attempts to make his point by stating that Jefferson located his slave quarters in sight of Monticello, whereas Moore does not want black people in his sight. This apparently refers to Moore's approval of the suggested location of a tree buffer or screen between his property and Fleming's proposed development.

The advertisement is in bad taste and is ill-mannered, short-tempered, and indiscreet. It is a poorly conceived and intemperate diatribe by an irate, disappointed, and frustrated black real estate developer who believes that his white opponent in a rezoning matter is not as concerned with pollution as he is apprehensive over the prospect of a "predominantly black, lower-middle-income" development adjoining his property. However, this reaction by Fleming was predictable and could well have been anticipated by Professor Moore when he left the academic community and entered the realm of real estate development and the controversial arena of zoning. The language of the market place is not always restrained, reasonable, or temperate. It is often sharp and unfair, and sometimes raucous, biting, and cruel.

Although the indignation of Professor Moore is understandable we should not allow the publication involved here to be the predicate of an action for libel and an award of damages. I would enter final judgment for the defendant.