COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Athey, Friedman and Callins
Argued at Williamsburg, Virginia


MICHAEL A. NIETO

v.        Record No. 0031-25-1

GREAT BRIDGE PRESBYTERIAN
  CHURCH, INC., ET AL.

KELLY ANNE NIETO

v.        Record No. 0032-25-1

GREAT BRIDGE PRESBYTERIAN
  CHURCH, INC., ET AL.

MEMORANDUM OPINION* BY
JUDGE CLIFFORD L. ATHEY, JR.
MARCH 31, 2026

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
David J. Whitted, Judge

Jesse B. Wiese (Joshua J. Coe; David F. Johnson; Anchor Legal Group, PLLC, on
briefs), for appellants.

John F. Sawyer (Kole F. Donaldson; Wolcott Rivers Gates, on brief), for
appellees.


On May 10, 2024, pastors Michael A. Nieto and Kelly Anne Nieto (collectively,

"appellants") filed a complaint alleging defamation, defamation per se, and tortious interference

with business expectancy against Great Bridge Presbyterian Church, Inc. ("Great Bridge"); The

Presbytery of Eastern Virginia, Inc.; The Great Bridge Administrative Commission; Rev. Brian

Harroff; James Cales, III; Rev. Beth Hilkerbaumer; Charity Houghton; Joyce Melvin-Jones;

Rev. David Rollins; and Joel Weaver (collectively, "appellees") in the Circuit Court of the City

of Chesapeake ("circuit court").  In response, appellees filed a plea in bar, which the circuit court

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

subsequently sustained based upon the court's determination that it lacked jurisdiction under the ecclesiastical-abstention doctrine. On appeal, appellants assert that the circuit court erred by applying the ecclesiastical-abstention doctrine because 1) the tortious conduct was not an act of church governance or religious doctrine; 2) the tortious conduct occurred 26 days after appellants' employment was terminated; 3) the circuit court treated the doctrine "as a perpetual bar to litigation instead of applying a reasonable time limitation"; and 4) the circuit court treated *Jae-Woo Cha v. Korean Presbyterian Church*, 262 Va. 604, 610 (2001), as controlling precedent. Finding no error, we affirm.

## I. BACKGROUND[1]

On May 10, 2024, appellants filed their complaint in the circuit court alleging that Great Bridge had sent a letter to church members that was defamatory, defamatory per se, and tortiously interfered with their pastoral relationship with the congregation. The complaint also detailed that appellants were "ordained reverend[s] in the Presbyterian Church" and were employed as pastors at Great Bridge. The complaint further alleged that on October 17, 2021, Great Bridge "dissolved" appellants' "pastoral relationship" with Great Bridge "in response to allegations about [appellants'] leadership as well as ongoing alleged conflicts within [Great Bridge's] congregation." The complaint also alleged that Great Bridge and appellants had previously negotiated and drafted a severance agreement, which was "the subject of another related lawsuit" in the circuit court.

The complaint further alleged that in a November 4, 2021 letter, appellants were "admonished to cease worship and fellowship gatherings with members and former members" of

---

[1] "[W]here no evidence is taken in support of a plea in bar, the trial court, and the appellate court upon review, consider solely the pleadings in resolving the issue presented." *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019) (quoting *Lostrangio v. Laingford*, 261 Va. 495, 497 (2001)). "In so doing, we accept as true all facts alleged in a plaintiff's complaint." *Montalla, LLC v. Commonwealth*, 303 Va. 150, 164 (2024).

Great Bridge. Appellants then received a letter on November 11, 2021, asserting that appellants had breached the previously negotiated severance agreement and, as a result, Great Bridge refused to make any of the payments that had been authorized as part of the severance agreement.

The complaint then alleged that on November 12, 2021, another letter was published to "approximately 750 unique email addresses." Appellants alleged that this November 12 letter included several defamatory statements. The complaint specifically listed certain statements in the letter as being defamatory "includ[ing] but not limited to the following" accusations regarding appellants' ability to manage the church finances:

- The "unhealthy leadership of the Pastors [Plaintiff] impacted: . . . The congregation's financial situation."
- Appellants "convinced less-knowledgeable session members that finances were fine despite a rapidly and frighteningly deteriorating financial situation."
- Appellants "cut spending on mission and service while adding spending for staff lunches and other amenities."
- Appellants gave staff members "substantial (many thousands of dollars) and unaffordable raises within 4 months of . . . arrival. Benefits were also added to staff members' packages."
- Appellants "concealed [the spending cuts] from the congregation and mission partners."
- Appellants "used their power, wielded church finances . . . in ways that further harmed the congregation."
- Appellants spent "more than $5,000 to redecorate the pastor's offices upon their arrival."
- Appellants "placed stipends for themselves in a draft budget without consulting . . . elders."
- Appellants "strongly lobbied for, and procured, significant raises for the staff" and "the raises were highly questionable from a budget standpoint."
- Appellants were paid "over $100k salary for a part-time pastor."

The complaint also referenced other allegedly defamatory statements relating to the misuse of appellants' authority, including:

- Appellants "pushed detractors from positions of leadership and eventually from the congregation."
- Appellants "[e]ngaged in reactive behavior that was interpreted as intimidating by many in the congregation."
- Appellants "actively engaged in pushing opposing voices from the session."
- Appellants "pushed [dissenters] from committees and other church bodies."
- That "[m]any individuals spoke to the [Administrative Commission for Great Bridge Presbyterian Church] about being intimidated by [the Plaintiff's husband]."[2]

The complaint characterized the above statements as being "capable of defamatory meaning and construction," and alleged that appellees "had a high degree of awareness of the falsity of the statements and intentionally made the statements knowing such statements were false and defamatory," and further that the "statements were made with actual malice." The complaint also alleged that as a result of the statements being published to the congregants of Great Bridge, appellants had "consequently been prejudiced in [their] profession and suffered injury to [their] personal and professional reputations."

Regarding defamation per se, appellants incorporated by reference the aforementioned statements and further alleged that the statements "were made with the intent to harm [appellants] by imputing unfitness to perform the duties of their profession or employment for profit and want of integrity in the discharge of these duties." The complaint further alleged that the allegedly defamatory statements "proximately caused [appellants] to suffer injury" and that appellants had "consequently been prejudiced in [their] profession and suffered injury to [their] personal and professional reputations." The complaint also alleged that the publication of the statements "was intended to cause the public to believe that [appellants are] unfit to serve in

---

[2] All bracketed alterations to the quotes from the November 12 letter are original to appellants' complaints, with "[the Plaintiff's husband]" appearing on Kelly's complaint, and "[Plaintiff]" appearing on Michael's complaint.

[their] professional capacity and lack[] the integrity necessary to perform the duties of [their] profession," resulting in "the loss of future income and professional opportunities."

The third count of the complaint alleged tortious interference with business expectancy, claiming that appellants "had personal relationships, prospective business relationships, and valid business expectancies with parishioners to provide ongoing spiritual guidance with a probability of future economic benefit," and that appellees knew of these relationships. The complaint then alleged that appellees "intentionally used improper methods to interfere with the personal and business relationships and expectancies" between appellants and parishioners. Appellants attached the severance agreement, the November 11, 2021 letter, and the November 12, 2021 email to the complaint.[3]

On June 17, 2024, appellees filed joint demurrers and pleas in bar, contending that the circuit court lacked jurisdiction over the case "[d]ue to the inextricable link between plaintiff's allegations, the Presbyterian faith, and the internal governance of the church." In the alternative, appellees asserted that the complaint failed to allege specific facts sufficient to prove all three counts of the complaint. The joint pleadings contended that "it [was] clear" from the complaint that the referenced statements only concerned appellees' "assessment of the most appropriate solution to a leadership conflict within Great Bridge." The joint pleadings further asserted that the alleged defamatory statements were merely opinion, and that the complaint failed to sufficiently plead actual malice or allege any special damages in support of the defamation claim. Appellees also contended that the statements were not defamation per se because they lacked the

---

[3] The November 4, 2021 letter was not attached to the complaint but appears to have been attached to a motion to compel discovery filed by appellants later in this litigation. The letter states that appellants "provided pastoral services to members and former members of [Great Bridge]," which "violate[d] both the severance agreement and the Book of Order's prohibition," as well as appellants' "ordination vows." The letter also referenced and included an attachment labeled "Ethical Responsibilities of Pastor and Congregation (When a Pulpit Becomes Vacant)."

required "sting."  Finally, the joint pleadings asserted that the complaint failed to allege sufficient facts to prove tortious interference and that appellants improperly split their claims by filing the present suit and a separate complaint regarding the severance agreement.

On October 31, 2024, the circuit court held a hearing on appellees' joint pleadings. During the hearing, appellees contended that the circuit court could not apply neutral principles of law because the circuit court would have to "take evidence about the motivations of church officials," which "would entangle the [circuit court] in matters of faith and doctrine."  Appellants argued that "the statements that were made [in the November 12, 2021 email] had nothing to do with church governance" but "had everything to do with damaging [appellants]."[4]

On November 22, 2024, the circuit court issued a letter opinion sustaining appellees' plea in bar and demurrer.  The circuit court held that it lacked subject matter jurisdiction over the dispute because "[e]ven the allegations that may appear susceptible of resolution through application of neutral principles of law" could not be separated from "issues of church doctrine, governance, and policy."  As an example, the circuit court said examining the statements about appellants' use of church funds would require the circuit court to "impermissibly decide as to whether such an expenditure is in keeping with sound church governance."  On December 4, 2024, the circuit court entered a final order sustaining appellees' plea in bar and demurrer. Appellants appealed.

---

[4] Appellees called Brian Harroff to the stand, who testified extensively about matters of church governance and doctrine.  But the circuit court expressly "did not consider" this testimony or "the exhibits offered by [appellees] at the hearing."

## II. ANALYSIS

### A. *Standard of Review*

"A plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery." *Cornell v. Benedict*, 301 Va. 342, 349 (2022) (quoting *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019)). "When the plea in bar depends on pure legal questions we review the circuit court's holding de novo." *Id.* The appellate court "review[s] a circuit court's judgment sustaining a demurrer de novo." *Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 164 (2022). "A demurrer tests the legal sufficiency of the facts alleged in a complaint assuming that all facts alleged therein and all inferences fairly drawn from those facts are true." *Givago Growth, LLC v. iTech AG, LLC*, 300 Va. 260, 264 (2021). When "evidence is presented ore tenus, the circuit court's factual findings 'are accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support.'" *Cornell*, 301 Va. at 349 (quoting *Massenburg*, 298 Va. at 216).

"Without [subject matter] jurisdiction the court cannot proceed at all in any cause." *Pure Presbyterian Church of Wash. v. Grace of God Presbyterian Church*, 296 Va. 42, 50 (2018) (alteration in original) (quoting *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869)). Accordingly, "[t]his Court must first review whether the circuit court had 'subject matter jurisdiction' over the pertinent matter de novo." *Atl. Korean Am. Presbytery v. Shalom Presbytery Church of Wash., Inc.*, 84 Va. App. 1, 18 (2025) (quoting *Andrews v. Richmond Redev. & Hous. Auth.*, 292 Va. 79, 85 (2016)). Any questions of law we encounter in discerning subject matter jurisdiction—including "[w]hether the doctrine of ecclesiastical abstention bars [a] claim"—we also "review de novo." *Episcopal Diocese of S. Va. v. Marshall*, 81 Va. App. 255, 265 (2024).

B.  *The circuit court did not err in applying the ecclesiastical-abstention doctrine.*

Appellants assert that the circuit court erred by applying the ecclesiastical-abstention doctrine because the conduct of Great Bridge was "not an act of church governance or religious doctrine."  We disagree.

The First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940) (incorporating the free exercise clause against the States); *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947) (same for establishment clause).  And Article I, Section 16 of the Virginia Constitution also expressly protects religious freedom, "provid[ing] (in part) that 'all men are equally entitled to the free exercise of religion, according to the dictates of conscience'" and "'[n]o man . . . shall otherwise suffer on account of his religious opinions or belief; but all men shall be free to profess and by argument to maintain their opinions in matters of religion, and the same shall in nowise diminish, enlarge, or affect their civil capacities.'"  *Marshall*, 81 Va. App. at 267 (quoting Va. Const. art. I, § 16).

Emerging from these provisions is the general principle that courts must refrain from becoming "entangled in essentially religious controversies."  *Reid v. Gholson*, 229 Va. 179, 187 (1984) (quoting *Serbian E. Orthodox Diocese, etc. v. Milivojevich*, 426 U.S. 696, 709 (1976)). This concept is generally referred to as the ecclesiastical-abstention doctrine.  *Marshall*, 81 Va. App. at 268.  The doctrine "protect[s] the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)).  This is because "any attempt by

[the] government to dictate or even to influence such matters" would be constitutionally forbidden.[5] *Id.*

The ecclesiastical-abstention doctrine also directs courts to refrain from "resolv[ing] issues of church governance." *Pure Presbyterian Church of Wash.*, 296 Va. at 51. Although matters of faith and doctrine are analytically distinct from matters of church governance, *see Reid*, 229 Va. at 189 (distinguishing a "doctrinal dispute between contending factions" or "disagreement among the members of the church in matters of religious belief" from matters of "church governance"), they are "closely linked" and often spill into each other, *Our Lady of Guadalupe*, 591 U.S. at 746. Prohibiting courts from addressing issues of church governance protects a religious institution's "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* Such decisions include "the freedom to . . . select and dismiss its religious leaders" or "ministers." *Marshall*, 81 Va. App. at 269; *Hosanna-Tabor*, 565 U.S. at 188. A contrary rule would permit the government to "infringe . . . a religious group's right to shape its own faith and mission through its appointments." *Marshall*, 81 Va. App. at 269 (quoting *Hosanna-Tabor*, 565 U.S. at 188).

But these protections "do[] not give religious institutions 'general immunity from secular laws.'" *Id.* at 268 (quoting *Our Lady of Guadalupe*, 591 U.S. at 746). For example, "where church property and civil rights disputes can be decided without reference to questions of faith and doctrine, there is no constitutional prohibition against their resolution by the civil courts." *Reid*, 229 Va. at 187 (citing *Jones v. Wolf*, 443 U.S. 595 (1979)); *see Carr v. Union Church of Hopewell*, 186 Va. 411, 417 (1947). Accordingly, "a secular court may adjudicate controversies

---

[5] Although appellees' argument centers on the application of the First Amendment to the United States Constitution, it also references the protections of religious liberty located in the Virginia Constitution. But "since existing constitutional doctrine suffices to resolve this dispute," we need not "break new ground to measure [the] differences" between the two here. *Marshall*, 81 Va. App. at 268.

arising in religious settings if it can do so based on 'neutral principles of law' that are 'completely secular in operation.'" *Marshall*, 81 Va. App. at 271 (quoting *Jones*, 443 U.S. at 602-603).

"In essence, for this Court to apply 'neutral principles,' the parties must plead a secular dispute at heart before it—one that does not require the civil court to decide an ecclesiastical question, and one devoid of '*underlying controversies* over religious doctrine.'" *Atl. Korean Am. Presbytery*, 84 Va. App. at 43 (quoting *Pure Presbyterian*, 296 Va. at 53-54). But this is not to say a court's ruling cannot affect church governance in any way. *See Pure Presbyterian*, 296 Va. at 54 (recognizing that "[r]esolution of a dispute using neutral principles of law may have an effect on church governance"). "A holding that courts categorically lack subject matter jurisdiction to adjudicate disputes that have an effect on church governance, even based on strict neutral principles, would place churches in a singularly disfavored position compared to all other litigants." *Id.* Instead, courts must be focused on the *dispute* itself and how it is pleaded, not the effect of any potential ruling on the merits. *Cf. Atl. Korean Am. Presbytery*, 84 Va. App. at 44 ("[E]cclesiastical abstention . . . provides for a distinct demarcation in the jurisdiction of civil courts pertaining to ecclesiastical matters, *dependent on the subject matter of the request for relief*." (emphasis added)). So this Court—in light of all surrounding protections and principles—must follow "the guiding question" for this appeal: "can a civil court adjudicate the matter before us based on neutral principles of law?" *Cath. Diocese of Richmond v. Smalls*, No. 1973-24-2, slip op. at 11 (Va. Ct. App. Nov. 5, 2025).[6]

---

[6] While not binding, unpublished cases may be cited as persuasive authority. *See* Rule 5A:1(f); *see also Smith v. Commonwealth*, 78 Va. App. 371, 383 n.4 (2023).

Virginia appellate courts have regularly addressed when the ecclesiastical-abstention doctrine bars courts from adjudicating defamation claims.[7] And this Court in *Marshall* set out five "considerations" for courts to use in answering the neutral-principles inquiry for defamation claims: 1) whether the case is pleaded such that the circuit court can "steer clear of 'the church governance issue'"; 2) whether evaluating the truth of the statement is dependent on ecclesiastical definitions; 3) whether "the dispute . . . arose in the context of a church-disciplinary investigation that culminated in the minister's firing, a decision at the core of a church's self-governance"; 4) whether the defamation claim "would raise intractable causation questions that would further ensnare the . . . court in religious matters," specifically in regard to damages; and 5) whether the plaintiff "pledged to follow rules" to utilize internal disciplinary proceedings that "sometimes require [the plaintiff] to forgo secular remedies." *Marshall*, 81 Va. App. at 274-76.

These considerations are meant to aid circuit courts in determining whether "a secular court may adjudicate controversies arising in religious settings . . . based on 'neutral principles of law' that are 'completely secular in operation.'" *Id.* at 271 (quoting *Jones*, 443 U.S. at 602-603). Accordingly, if an allegedly defamatory statement takes a court or fact finder into a "religious thicket," civil courts do not have subject matter jurisdiction to entertain the dispute. *Reid*, 229 Va. at 187 (quoting *Serbian E. Orthodox Diocese*, 426 U.S. at 719). And if some

---

[7] *See, e.g.*, *Jae-Woo Cha*, 262 Va. at 615 (holding that a claim for defamation per se based on church leaders telling deacons that a pastor purportedly mismanaged funds was barred because it would compel a court "to consider the church's doctrine and beliefs because such matters would undoubtedly affect the plaintiff's fitness to perform pastoral duties"); *Bowie v. Murphy*, 271 Va. 126, 135 (2006) (holding that a defamation claim could proceed against a pastor who told church leaders that a deacon assaulted another church member because the "veracity and the impact [the statements] had on [the plaintiff's] reputation [was] the same as if the statements were made in any other, non-religious context"); *Marshall*, 81 Va. App. at 274-77 (holding that a claim for defamation per se was barred when a reverend told parishioners that the church rector committed sexual misconduct within the meaning of ecclesiastical texts).

- 11 -

statements can be resolved by neutral principles and some cannot, then civil courts must sequester those implicating ecclesiastical-abstention doctrine so the actionable statements can still be reviewed. *See Handberg v. Goldberg*, 297 Va. 660, 672 (2019) (holding that a circuit court erred because it "violated its 'essential gatekeeping function' of ensuring that a defamation action only proceed 'upon statements which actually may defame a plaintiff'" (quoting *Webb v. Virginian-Pilot Media Co., LLC*, 287 Va. 84, 90 (2014))); *see also Raytheon Tech. Servs. Co. v. Hyland*, 273 Va. 292, 304-06 (2007) (holding that three of five statements at issue in a defamation claim should not have been submitted to the jury while the others "were properly submitted").

Accordingly, we turn to the elements of the appellants' claims. Appellants pleaded, inter alia, defamation and defamation per se. Defamation is the "(1) publication of (2) an actionable statement with (3) the requisite intent." *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015). "An 'actionable' statement is both false and defamatory," meaning that the "false statement must have the requisite defamatory 'sting' to one's reputation." *Id.* at 91-92. Some statements are "actionable per se," meaning that a plaintiff does not need to demonstrate financial loss resulting from the false statement. *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713-14 (2006) (citing *Fleming v. Moore*, 221 Va. 884, 889 (1981)). For example, false statements "imput[ing] to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment," and false statements "prejudic[ing] such [a] person in his or her profession or trade" are "actionable *per se*." *Fleming*, 221 Va. at 889. But defamation per se merely relieves a plaintiff "from proving the quantum of his damages for injury to reputation, humiliation, and embarrassment." *Great Coastal Express v. Ellington*, 230 Va. 142, 152 (1985). For defamation *per quod*, meanwhile, a plaintiff must specifically prove financial loss resulting from the false, defamatory statement. *See Gov't Micro*

*Res., Inc. v. Jackson*, 271 Va. 29, 40 (2006). "[A]llegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used." *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 8 (1954); *see Schaecher*, 290 Va. at 93 ("To determine whether a statement can be reasonably understood as stating or implying actual facts, whether those statements are verifiable, and whether they are reasonably capable of defamatory meaning, we must examine them in context.").

Here, the appellants base their defamation claims on a list of statements that can be categorized as either 1) purported mismanagement of funds or 2) the intimidation and shunning of "dissenters" or other members of the congregation. All statements in each category are barred from civil-court review because of the ecclesiastical-abstention doctrine. First, the complaint alleged defamatory statements regarding appellants' financial behaviors, such as spending more than $5,000 to redecorate pastoral offices, each receiving a $100,000 annual salary as a part-time pastor, and placing stipends for themselves in a draft budget "without consulting elders." The complaint also cited statements alleging that appellants "cut spending on mission and service" while adding spending for other expenses. The statements identified as actionable also included allegations that appellants had "lobbied for, and procured, significant raises" and benefits for staff members, raises that "were highly questionable from a budget standpoint." In addition, the complaint cites allegations that appellants' actions had the effect of harming the congregation by "wield[ing] church finances." Appellants also claim as actionable statements that their "unhealthy leadership" impacted the financial situation of the congregation and that appellants "concealed [the spending cuts] from the congregation and mission partners." Appellants further cite Great Bridge's allegation that the pastors "convinced less-knowledgeable session members that finances were fine despite a rapidly and frighteningly deteriorating financial situation."

- 13 -

Each of these statements would require us to evaluate and determine the appropriate financial management standard for pastors serving as leaders in the Presbyterian denomination and whether and to what extent the appellants may have breached that standard as determined by the denomination. Certainly, if Great Bridge were a for-profit business established and operating based solely on secular principles, this Court may have jurisdiction to determine if the financial actions of appellants complied with any applicable non-ecclesiastical, civil standards. However, Great Bridge is a religious institution established as a local church by the Presbyterian denomination and therefore is subject to the religious denomination's doctrinal and organizational documents, including certain policies and beliefs that pertain to proper church order, practices, governance, and leadership. As noted previously, the record contains the November 4, 2021 letter—the purported violation of which led appellees to send the November 12, 2021 letter—that references the Book of Order, appellants' "ordination vows," and a document that details the "[e]thical [r]esponsibilities of [a] [p]astor" upon leaving a congregation. Hence, this dispute is inextricably entwined with the Presbyterian Book of Order. As such, the dispute cannot be decided based solely on neutral or secular principles that would permit us to objectively evaluate the correctness of appellants' actions as pastors, including but not limited to their actions regarding the financial management of Great Bridge.

Moreover, determining whether the statements are actionable would require us to determine whether the financial decisions made by appellants render them "unfit[] to perform the duties of an office" or if appellants lack "integrity in the discharge of the duties of such an office." *Fleming*, 221 Va. at 889. Without first determining the proper method that a pastor serving a Presbyterian church should responsibly exercise when administering the finances of a Presbyterian church, we cannot determine whether the statements regarding how the appellants allegedly misused that authority are actionable. And a secular judicial body determining the

- 14 -

fitness and qualifications of the office of a pastor who governs a church would violate that church's "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 591 U.S. at 746. Hence, evaluating the fitness of pastors in the Presbyterian Church is a task for which this Court is ill-equipped to and, indeed, forbidden from engaging in, as it is "closely linked" with matters of the Presbyterian faith. *Id.* Thence, we cannot determine from "'neutral principles of law' that are 'completely secular in operation'" whether the statements of alleged mismanagement of funds by the appellants are defamation or defamation per se. *Marshall*, 81 Va. App. at 271 (quoting *Jones*, 443 U.S. at 602-603).

Similarly, we cannot use neutral principles of law to discern whether the statements about the intimidation and shunning of "dissenters" or other members of the congregation are actionable. Here, the complaint alleged that appellants were defamed by statements that they "pushed detractors from positions of leadership and eventually from the congregation," "[e]ngaged in reactive behavior that was interpreted as intimidating by many in the congregation," "actively engaged in pushing opposing voices from the session," and "pushed [dissenters] from committees and other church bodies." The complaint also alleged that many individuals spoke to the Administrative Commission for Great Bridge Presbyterian Church "about being intimidated" by Michael. Again, whether a "dissenter" or an "opposing voice" was "intimidated" by appellants requires an examination of what appellants were preaching and communicating in their role as pastors, forcing this Court to discern who is or is not a dissenter based on the conduct of appellants during church services, meetings of the session, and other times when appellants communicated to the congregation. Judicial bodies are without footing to adjudicate the merits of religious disputes between pastors and their congregation. *See United States v. Ballard*, 322 U.S. 78, 86 (1944) ("Heresy trials are foreign to our Constitution.").

- 15 -

Furthermore, examining the "plain and natural meaning" of the statements as they appear in the context of the email further shows why neutral principles are unable to resolve this dispute. *Carwile*, 196 Va. at 8. The November 12, 2021 email is addressed to "Brothers and Sisters in Christ" and states that the email was prompted by the Administrative Commission's "obedience to [their] charge." The email states that being a pastor "requires that one maintain connection with those in opposition" and "maintain a healthy differentiation from supporters." Appellants were negatively described as being "uncoachable" and resistant to counsel by members of the Administrative Commission. The email also states that appellants' actions "undermined, and eventually nullified, the ability of the session to govern Great Bridge," with the session being unable to form a quorum and requiring the Administrative Commission to ultimately take "original jurisdiction" because "the session could not function." The email notes that although "Christians are called to forgive" and that "there is always healing in Christ," the Administrative Commission nevertheless "unanimously determine[d] that [Great Bridge's] mission under the Word imperatively demanded dissolution of the Nietos' pastoral relationship with [Great Bridge.]" Additionally, the email cites to "The Book of Order" as prohibiting appellants' conduct and notes that appellants "affirm[ed] the Presbyterian tradition of discerning in community and respecting the hierarchical structure" of the Presbyterian church in submitting the issue to the Administrative Commission to resolve. Accordingly, viewing the statements in the greater context of the email and analyzing the statements as its readers would have, evaluating appellants' claims would require this Court to be entangled in a "religious thicket." *Reid*, 229 Va. at 187.[8]

_____

[8] The appellants also pleaded a claim for tortious interference of business relationships and expectancy. *Jae-Woo Cha* applies to this claim and precludes our review, because "a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an intentional interference that caused the termination of the at-will contract, *but also that the defendant employed improper methods*." 262 Va. at 613 (emphasis added) (noting that the

- 16 -

Our conclusion regarding appellants' claims is supported by binding Virginia Supreme Court precedent and consistent with the *Marshall* factors. In *Jae-Woo Cha*, the plaintiff sued a Korean Presbyterian Church for wrongful termination, tortious interference, and defamation. 262 Va. at 607. The defamation claims arose from a meeting of the congregation where the plaintiff was accused of borrowing a large amount of money from the congregation and not returning it. *Id.* at 609. The trial court dismissed the plaintiff's claims for lack of subject matter jurisdiction because "adjudication of the plaintiff's claims would require that the court involve itself in ecclesiastical concerns." *Id.* at 608. On appeal, the Virginia Supreme Court affirmed, holding that "a civil court may neither interfere in matters of church government nor in matters of faith and doctrine." *Id.* at 611-12 (quoting *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 116 (1952)). It held that neutral principles could not resolve the dispute because "[r]esolution of the plaintiff's claims by a civil court would have required that the circuit court adjudicate issues regarding the church's governance, internal organization, and doctrine, and such judicial intervention would have limited the church's right to select its religious leaders." *Id.* at 612.

Our conclusion also comports with the *Marshall* factors. Although not as problematic as in *Marshall*, the presentation of appellants' case makes it difficult for courts to "steer clear of 'the church governance issue,'" in that appellants' allegedly defamatory statements all concerned monetary and church governance matters. *Marshall*, 81 Va. App. at 274-76. Additionally, as noted previously, we cannot determine the fitness of appellants for their duties—an essential part of whether a statement is actionable—without examining ecclesiastical standards. *Id.* And

ecclesiastical-abstention doctrine does not "permit[] a circuit court to decide whether the plaintiff had a valid contractual relationship or business expectancy to serve as a pastor"). Determining the appropriateness of Great Bridge's methods would likewise require us to resolve questions of doctrine regarding the proper method for discharging a pastor from leadership, thus further precluding our ability to exercise jurisdiction over this matter.

although the record does not establish the degree of formality associated with the investigation into the appellants' conduct, the dispute did at least partially "ar[i]se in a context of a church-disciplinary investigation that culminated in the minister[s'] firing."[9]  *Id.*  Certainly, as noted previously, the appellants' claims "raise intractable causation questions that would further ensnare the . . . court in religious matters."  *Id.* at 276.  Hence, the circuit court did not err in determining that it lacked jurisdiction over appellants' complaints.

### III.  CONCLUSION

For these reasons, we hold that the ecclesiastical-abstention doctrine bars our consideration of appellants' claims and we affirm the judgment of the circuit court.

*Affirmed.*

---

[9] Appellants argue that the circuit court erred by treating the ecclesiastical-abstention doctrine "as a perpetual bar to litigation instead of applying a reasonable time limitation."  But appellants cite no authority as to what a "reasonable time limitation" would be and thus, have waived this assignment of error.  *See* Rule 5A:20(e).  And a lack of subject matter jurisdiction is *always* a bar to adjudication of a claim.  *See Virginian-Pilot Media Cos., LLC v. Dow Jones & Co.*, 280 Va. 464, 467-68 (2010) ("The lack of subject matter jurisdiction cannot be waived and such jurisdiction cannot be conferred on a court by the litigants.").  Additionally, relying on *Pure Presbyterian* and *Bowie*, appellants also argue that the circuit court erred in applying the ecclesiastical-abstention doctrine because "the tortious conduct occurred 26 days after appellants' employment was terminated."  But neither case cited by appellants provides a timeframe for limiting the applicability of the doctrine, nor was timing a consideration of the Virginia Supreme Court's holding in those cases.  *See Bowie*, 271 Va. at 135 ("Bowie pled his defamation claims in such a manner that the circuit court, unlike the trial court in *Cha*, can consider them in isolation, separate and apart from the church governance issue."); *Pure Presbyterian*, 296 Va. at 53 ("There is nothing inherently ecclesiastical about an agreement to merge two entities.").  Rather, like all questions of subject matter jurisdiction, whether the allegations in the complaint can be interpreted using neutral principles is a question that will remain regardless of when the dispute arose and a question that "can be initially raised at any point during the proceedings, including on appeal."  *Pure Presbyterian*, 296 Va. at 50; *see Morrison v. Bestler*, 239 Va. 166, 170 (1990) ("A defect in subject matter jurisdiction cannot be cured by reissuance of process, passage of time, or pleading amendment.").